## Campbell *versus* Hand *et al.*

*Implied assumpsit.—Covenants to repair mill-dam, contained in agreement for construction, how continued between subsequent owners.—Liability of owners as co-tenants for repairs.*

1. Where by written agreement, the owners of land on opposite sides of a river agreed to build and keep in repair a dam, for the use of their respective mill properties, and the mill and interest of one of them was sold by execution on a judgment entered before the agreement was made, the assent of the sheriff's vendee, who used the dam as theretofore, and of the remaining co-tenant, was held sufficient to continue the covenants in the agreement, though, in strictness, not running with the land, because of the priority of the judgment.

2. As the use of the dam by the sheriff's vendee was by election, and adoption under the contract, he could not escape the burthen of maintaining and keeping it in repair and of consequent contribution for the expense necessary therefor: and the concession by the co-tenant to him of the benefits claimed by force of the contract, is a sufficient consideration under the circumstances, to raise an implied promise to pay his proportion of the repairs.

3. *Semble*, that, under the Mill Dam Act of 23d March 1803, there may be a tenancy in common of a mill-dam erected by the owners of the land on the opposite sides of a navigable stream ; and that the contribution for repairs made thereon by one tenant in common, is recoverable from the others, as in case of any other real estate.

ERROR to the Common Pleas of *Luzerne county*.

This was an action of trespass on the case, by Elisha J. Hand, Chauncey Hand, Leonard White, doing business as Hand, White & Co., and J. White, against Charles B. Campbell.

The material facts of the case were as follows :—

On the 5th of February 1844, Alexander Jeffreys was the owner of a tract of land and a grist-mill seat on the west side of the Lackawanna river. The mill was built in 1832, and the dam, known in this case as the *old* dam, was finished in 1833 or 1834, and furnished the water to drive the mill. Matters so remained until the date first mentioned, when articles of agreement were concluded between Mr. Jeffreys and one Jerrison White, by which the latter (who had become the owner of land on the opposite side of the river) was to have the privilege of constructing a *new* dam and joining it to the mill-race of Jeffreys. A synopsis of the provisions of this contract may be thus stated :—

1. The dam was to be built by White at his own expense; Jeffreys, however, permitting him to use certain stone and material from his premises.

2. When the dam was completed, Jeffreys was to have the first right to the water from the mill-pond, sufficient to drive two wheels of a certain size. When these were supplied, White was to have enough water to drive his machinery, and then the surplus to be used in common.

3. A release by Jeffreys of a certain right of way over White's

[Campbell *v.* Hand *et al.*]

land, and acceptance in lieu thereof of a lane or pathway from the highway to other land of Jeffreys.

4. Each party was to build his own bulkhead, and to be at equal expense in keeping the dam in repair.

Prior to this contract, viz., on the 11th of July 1842, a judgment had been entered by John Vaughn against Alexander Jeffreys, in the Common Pleas of Luzerne county (No. 832, August Term 1842), for $1740. Jeffreys was then the owner of the mill property.

On the 15th of October 1845, A. A. Winton & Co. recovered a judgment against Alexander Jeffreys (279, November Term 1845) for $193.51.

Upon both these judgments executions were issued to August Term, 1846, and both were levied *inter alia* on the mill property of Jeffreys, but without mention of the agreement between Jeffreys and White. Writs of *venditioni exponas* issued to November Term, 1846, upon both judgments, and the property was sold by the sheriff to H. W. Nicholson, who assigned the deeds to Peter Campbell, the father of Charles B. Campbell. Peter Campbell afterwards died, leaving the present defendant his heir at law.

It was admitted that the defendant had the title of Jeffr' and the plaintiffs that of White, to the lots on the opposite s. of the Lackawanna river.

In February 1861, a heavy freshet carried off a portion of the dam ; one witness says half of it, another says about thirty feet, on the Campbell side.

On the 22d of May 1861, Hand, White & Co. (whose improvements included an axle factory, planing-mill, and saw-mill) notified Charles B. Campbell of the destruction of the dam, and called upon him to meet them with a view of arranging to rebuild. To this Campbell replied, declining to assist in the rebuilding, and denying his liability to contribute. Hand, White & Co. then proceeded to rebuild the dam, and afterwards brought this suit to recover one-half the cost.

The Lackawanna river is a public highway, and at the point where the dam crosses it is about one hundred and fifty feet wide.

The court below (PEARSON, P. J., presiding) instructed the jury: "1. That the agreement of 5th February 1844 'made the parties joint owners or tenants in common of the dam.'

"2. That the claim by Campbell to the use of the water on the same terms as provided by the contract, amounted, in law, to an engagement on his part to bear one-half the expense of keeping the dam in repair.

"3. That, independent of the contract, Campbell could be called upon to contribute to repairs of the dam, if he had claimed the benefits arising from it.

[Campbell *v.* Hand *et al.*]

"4. That, under the Mill-Dam Act, no one has a right to erect a dam across the stream unless he own the land on each side, or have the consent of the opposite owner; and

"5. That the rebuilding of the dam in 1846 by Hand, White & Co., on the occasion of the former flood, at their own expense, was no evidence of their construction of the rights and liabilities of the parties."

Which were the errors assigned by defendant after a verdict and judgment in favour of plaintiffs.

*Stanley Woodward*, for plaintiff in error.—The fact that plaintiffs and defendant were tenants in common of the new dam, was assumed by the court below by virtue of the agreement made between their predecessors in title, on 5th February 1844. This fact, if granted as to the original parties, would not apply to the present owners. But the agreement did not create the relation of tenants in common.

The lands of both Jeffreys and White were bounded in their deeds on the banks of the Lackawanna river. Jeffreys owned a right of way over the land of White. He had on hand the materials which would be required in building a new dam. He granted to White the privilege of using these materials to build a dam, surrendered his right of way, and in consideration thereof was to have the use of a certain portion of the water. To a certain extent he is the preferred party in its use; but this amounts to little, as the evidence shows there was never any lack of water, except in very dry seasons. From the evidence, White was the party to be chiefly benefited by the new dam. Jeffreys, for twelve years, had been running his mill with water from a dam built for the very purpose. White was a new comer, and was about to engage in manufacturing. He needed a dam, and could well afford to build it if the materials were furnished him, and the right of way across his land surrendered.

The Lackawanna river is a public highway. It has never been granted by the Commonwealth to any of her citizens, and private surveys, bounding on the river, stop at low-water mark. In regard to such rivers, the Mill-Dam Act of 23d March 1803 is but a license to the riparian owner. He can have no estate in the river or its bed. Can two parties, owning land on opposite sides of such a river, bargain themselves into such a tenancy of it as implies some estate residing in them? Is not such a bargain against public policy, and void? We refer in this connection to Monongahela Navigation Co. *v.* Coons, 6 W. & S. 112; Shrunk *v.* Schuylkill Navigation Co., 14 S. & R. 79; Susquehanna Canal Co. *v.* Wright, 9 W. & S. 11; Barclay Railroad & Coal Co. *v.* Ingham, 12 Casey 194.

The learned judge held that the agreement between Jeffreys and White was utterly destroyed by the sheriff's sale, under

[Campbell *v.* Hand *et al.*]

which Campbell claims title.  But he also charged the jury that Campbell must be held to have revived and ratified that agreement, because first, of his statements that he claimed the use of the water; and, secondly, because independent of this, the mere enjoyment of benefits raised a liability to share the burdens of maintaining the dam.  It does not seem that the evidence justifies the allegation of any contract arising out of the statements of Campbell.  None of the witnesses testify to any allegation by Charles B. Campbell, in the presence of the plaintiffs, or which was communicated to them, of a contract between the parties.  Suppose there never had been any such agreement as that of 5th February 1844, between Jeffreys and White, could occasional remarks of Campbell, to his own employees, be construed into a contract with White, Hand & Co. that he would, for all time, hold himself liable to contribute one-half the expense of maintaining the dam?  And if the agreement was destroyed by the sheriff's sale, the position, in law, of these parties, is just what it would be had no such agreement been made.  An encumbrance, which has been discharged by a judicial sale, cannot be galvanized into life by declarations of the party against whom it stood.  A new agreement may be made, but a dead obligation cannot be ratified so as to live again.

We do not deny that Campbell, after his purchase from Nicholson, used the water furnished by the new dam.  The plaintiffs below claimed, and the learned judge held, that this raised an implied duty and promise, on the part of Campbell, to contribute to its maintenance, independent of any contract.  We submit that in this there was error.  Where there is a special privity of contract, as in the case of sureties, or joint and several debtors, or endorsers and acceptors of a negotiable security, a payment by one raises an implied promise of contribution by the others.  But the mere fact of a benefit enjoyed is not enough to raise a promise to contribute: Exall *v.* Partridge, 8 T. R. 308; Addison on Contracts, p. 57.

Charles B. Campbell, upon the death of his father, became the owner of the mill.  Finding the dam built, he used it.  When it went out, he made his arrangements to use the old dam again.  Hand, White & Co. judged it expedient for their own interests to rebuild the dam, and call upon Campbell to join them in doing so, which he promptly declined.  In all this there was neither a request nor a promise on his part, and it can readily be seen that the plaintiffs found sufficient motive, in their own profit, for wishing the dam rebuilt, without special reference to the interests of Campbell.  If Campbell can be compelled to assist in rebuilding this dam whenever it needs repair, then every person who uses water from a neighbour's well, and every traveller who drives over a private road or bridge, may be forced to contribute

[Campbell *v.* Hand *et al.*]

to the repairs which accident or time may render necessary to either the well, the road, or the bridge.

The last specification of error relates to the fact, which was proved in the case, that, on a former occasion, when the dam was injured by a flood, the plaintiffs made repairs without calling upon the opposite owner to contribute. We regarded this as some evidence of their construction of the relations of the parties. The court, in effect, instructed the jury to disregard this fact. We respectfully submit that this was error.

The case was taken away from the jury on every question involved, save only as to whether the work done on the dam was "repairs" or "rebuilding."

*Alfred Hand*, for defendant in error.—We rely upon two points.

First. The general principle that one tenant in common is liable for his proportion of necessary repairs to the common property.

Secondly. That the peculiar circumstances of this case raised an implied *assumpsit* on the part of the defendant to be at one-half the expense of repairs.

In support of the first position, the following cases are cited : Coke upon Litt. vol. 1 (200 b.) marginal; Bouvier's Institute, vol. 2, p. 315; Comyns's Digest, vol. 4, 115, citing Coke upon Litt. The principle is affirmed in Yates *v.* Cole, 6 Eng. Com. Law Reps. 305, 2 B. & B. 660. It is recognised in Anderson *v.* Grubb, 1 Ashmead 136. For the second position taken, the defendant refers to the facts of the case, to wit, the beneficial nature of the work done, the previous conduct of the defendant assisting in former repairs, claiming his rights as defined by the contract between White and Jeffreys, and to the general principle, upon which it is unnecessary to cite cases, that benefits derived are sufficient consideration to raise an implied *assumpsit*.

See also, as to the right of contribution, Bouvier's Inst. vol. 4, p. 228.

The argument of the plaintiff's counsel seems to be burdened with the assumption that the parties to this suit were not tenants in common. That question was passed upon by the jury.

We submit the following considerations, showing that the parties were tenants in common : How did they hold, if not in that capacity ? Here was a valuable structure made with joint materials and labour. There was a unity of possession, it matters not how that possession was acquired. The dam belonged equally to the parties. There was evidence submitted in the case, outside of the contract between Jeffreys and White, to show that the parties were tenants in common. But when we look at that contract and the testimony offered in connection,

[Campbell *v.* Hand *et al.*]

with it, the evidence is increased tenfold. The question of an adoption of the contract after the sheriff's sale was left. to the jury. Even though that contract were abrogated, it might still exist for certain purposes. It might be assimilated to a contract of partnership which may have been cancelled by the parties, yet exist to show how the partners after dissolution owned certain property acquired while the partnership was in force, and the extent of their respective interests.

It matters little what kind of property this dam be considered, whether real, personal, or mixed. It partakes of realty. It is not the river nor the bed of the stream that is held in common, but the dam and the use of the water, subject to the rights of the Commonwealth. There can be·a tenancy in common of such property, and privileges even, when the river and land under· it belongs to the Commonwealth. If the state is injured, she has her remedy; but that does not affect the rights and liabilities of these parties.

This is a case where the obligations to repair were mutual. Large and flourishing mills exist on both sides of the river. The interests of the plaintiffs in having the repairs done perhaps are somewhat greater than the interest of the defendant by as much as their property is more valuable, and they are more in number. They have a little more at stake in lying idle. The defendant sits down with dogged indifference, hoping and expecting the plaintiffs' patience will be first exhausted, and that they will repair his dam.

The plaintiff in error says it is against public policy to own dams in that way. We answer, that public policy rather demands a discouragement of such inaction, and lays down the rule found in Coke upon Littleton, that "owners are in that case bound *pro bono publico* to maintain houses and mills which are for habitation and use of men."

The learned judge below states the law very briefly and distinctly. He left the three facts which were of any importance in the case wholly to the jury, viz. :—

First. Whether the contract between Jeffreys and White had been affirmed or adopted by those holding under the sheriff's vendee.

Second. Whether the parties were tenants in common.

Third. Whether the work done was repairing or rebuilding.

Another question of not much importance in the case was as to the repairs made by the plaintiffs in 1846. The evidence showed that no part of the dam was then swept away, but that the whole of the plaintiff's buildings were carried off. The water went around the dam. The plaintiff, in rebuilding, took the·precaution to build upon the new bank thus made by the flood, thereby securing their own safety and a greater volume

of water for both parties. To say that this was a construction by the plaintiffs below of the contract, is to misconstrue actions.

The opinion of the court was delivered, March 23d 1865, by

THOMPSON, J.—It is unessential, in order to a correct determination of this controversy, to become involved in a consideration of the binding effect of the original contract between Jeffreys and White, for the erection and maintenance of the dam in question, after the sale of the mill and interest of the former, in a judgment against him before its date. The learned judge of the special court, held the defendant bound to contribute for repairs if he claimed the benefits of the covenants, and they were conceded to him by the co-tenant. These were facts proved and left to the jury, and they have found them to be true. The inquiry naturally arises in the mind, is there any good reason why this should not be so? I will not undertake to say that the contract created covenants running with the land, because the covenantor could not impose an encumbrance or duty that might not be divested by a sale of the premises so encumbered by a prior judgment, a sale on which would carry back the title to a period coeval with the date of the lien; and the case is not to be rested on this ground. If the covenants had been anterior to the lien of the judgment, then they would in form and in fact have been clearly covenants running with the land. Thus the matter stood under the sheriff's sale. Now why should not the assent of the sheriff's vendee and that of the remaining co-tenant be sufficient to continue the original covenants in their original efficiency? I do not think it is a sufficient negative of the inquiry to say that the remedy on the covenants is not pursued. The same objection might be urged in familiar instances resembling this. The property of a landlord is seized and sold, and there is a tenant whose lease is subsequent to the judgment; it is the law that the acceptance of rent by the sheriff's vendee is a binding recognition of the lease, and the tenant would have the right of legal remedies against his new landlord. So the acceptance of services raises an implied promise to pay for them. Where a duty to contribute exists, the action is generally on the duty or rather on the *assumpsit* arising out of the duty, and not always on the instrument or debt discharged. So here we have demands on part of the defendant for the benefit conferred on his property under the covenants between the original joint owners or tenants in common of the mill-dam. They are acceded to, and his enjoyment is henceforth by election and adoption under the contract, and he cannot escape the concomitant burden of maintaining, by contributing his due proportion of the expense of keeping up the dam, the benefits of which he claimed to exist by force of the contract. We doubt not he might have repudiated it, but did not,

[Campbell v. Hand et al.]

and he must stand to his election. He has received consideration for it in the concession to him by the other party on whom the demand was made, and this was sufficient under the circumstances to raise an implied promise to pay his proportion of the repairs. He must not blow hot and cold in the same breath.

The Mill-Dam Act of 23d of March 1803 licenses the owners of lands on navigable streams to erect dams on the same, under the conditions mentioned, subordinate to the rights of the public, and generally the passage of fish. Against all but the public, it is a permanent or real right. It may not be disturbed excepting by proceedings in the name of the public. It was decided in Criswell v. Clugh, 3 Watts 330, that even where a dam erected under the act became a public nuisance, yet the private right of abatement did not exist. There is therefore, in a subordinate sense, property in the bed of the stream, which may be held and transmitted like any other real interest by a riparian owner as an incident of his estate; and where a dam is erected for the use of a mill, no one can doubt that it would pass as appurtenant to the mill. This being the nature of the right, why may not there be a tenancy in common of a dam erected by the owners of the land on the opposite sides of a navigable stream? It cannot be doubted, I think, but that there may, and there doubtless are many instances of the kind. This is not very material to the case in hand, excepting to show that the character of the property to which the contribution was due differed essentially in nothing from the ordinary case of contribution for repairs by tenants in common of other real estate.

We discover no error in this record, and the

Judgment is affirmed.