## Munhall *versus* Pennsylvania Railroad Co. and Allegheny Valley Railroad Co.
## Jackson & Brother *versus* Same.

1. Railroad companies have an undoubted right to enter into a just and fair arrangement with a corporation or association whereby their business will be increased, although the effect of the arrangement may be to take business from others. With a view of increasing their business, they may extend more favorable terms to all shippers, although others engaged in the same business may be incidentally injured thereby. The fact that the public patronize those lines of transportation which give the most favorable terms constitutes no ground of complaint.

2. The Allegheny Valley Railroad crosses the Pennsylvania Railroad at Allegheny Junction. To compete more successfully with the river transportation, the Allegheny Valley Railroad carried crude oil to the refineries at Pittsburgh, and the manufactured product back to Allegheny Junction, at a uniform rate, thus giving to the refiner at Pittsburgh as favorable terms as if located at Allegheny Junction, and thereby securing a uniform rate on oil from the oil regions to the seaboard. *Held*, that to deny the right to make such an arrangement would be an unwarranted interference with the management of the business of the railroad, and deprive the public of the benefit of the competition to which it is justly entitled.

3. The right of connecting railroads to make contracts for through rates is incident to their powers unless prohibited by their charter. Where such contracts are not unjust, unconscionable or in restraint of trade, they will not be interfered with.

November 14th 1879. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY and STERRETT, JJ. GREEN, J., absent.

Error to the Court of Common Pleas, No. 1, of *Allegheny county :* Of October and November Term 1878, No. 73 and 74.

Case by William Munhall against the Pennsylvania Railroad Company and the Allegheny Valley Railroad Company, and by Jackson & Brother against the same defendants.

These two actions were of like character, and depending upon like proofs, and by consent of the parties, were tried together in the court below.

They were actions against the Pennsylvania Railroad Company and the Allegheny Valley Railroad Company for conspiracy and injuring the plaintiffs, respectively, in their business.

The plaintiffs were engaged in the transportation of crude oil in bulk boats and barges, *via* the Allegheny river, from the oil regions of Pennsylvania to Pittsburgh and vicinity, and in the prosecution of their business, had invested in and were using steamboats, barges, bulk boats and other appliances specially built for and adapted to said trade. They had built up a steady and prosperous trade, and had been engaged in the same for a number of years prior to 1871. A large number of persons at Pittsburgh and in the vicinity thereof were engaged in the business of refining crude

[Munhall *v.* Pennsylvania Railroad Co.]

oil, and shipping the refined product to the eastern markets over the Pennsylvania railroad. These refiners had been for several years the regular customers of the plaintiffs in their aforesaid transportation business.

The Pennsylvania railroad was, and is, the direct route for transportation of refined oil from Pittsburgh to the eastern market. During much of the time covered by the proofs in these cases it was the only route, and during the whole period was the principal and favorite route with refiners at Pittsburgh and vicinity.

The Allegheny Valley Railroad was completed to Oil City and opened about the year 1869, and it has since been the only route by rail for the transportation of crude petroleum from the oil regions of Pennsylvania to Pittsburgh and vicinity.

The natural and cheapest route for the transportation of crude petroleum from the oil regions of Pennsylvania to Pittsburgh is the Allegheny river, and for some time after the opening of the Allegheny Valley railroad to the oil trade, as above mentioned, the plaintiffs continued to supply their customers, the refiners, at Pittsburgh and vicinity, with crude oil brought down the Allegheny river in their bulk-boats and barges.

In the year 1870, and prior thereto, in order to compete with the river trade in the transportation of crude petroleum to Pittsburgh and vicinity, the Allegheny Valley Railroad Company allowed rebates or drawbacks to shippers of crude petroleum over its road ; but this policy left the plaintiffs to open competition, and they, by lowering their rates, retained their trade.

It was in evidence that early in the year 1870, at the office of the Allegheny Valley Railroad, at Pittsburgh, the president of the road remonstrated with a large transporter of crude petroleum to Pittsburgh, and who had been receiving rebates from the road, against his running oil to Pittsburgh by river, and then and there declared he would " fix this barge business so there couldn't be any more barge oil run on that river."

It was also in evidence that about 1870 the president of the Allegheny Valley Railroad declared to a Pittsburgh refiner and a broker at Pittsburgh for the purchase of crude petroleum for refiners, that the shipping of crude petroleum to Pittsburgh by the river should be stopped, and that he would compel the barges " to stop the business and go out of the business."

Shortly thereafter the Pennsylvania Railroad Company and the Allegheny Valley Railroad Company entered into an arrangement whereby the Pennsylvania Railroad Company allowed to Pittsburgh refiners of crude oil upon eastern shipments of oil refined at Pittsburgh and vicinity from crude petroleum brought to their refineries from the oil-producing regions of Pennsylvania, *via* the Allegheny Valley Railroad, a drawback or rebate upon the freight or cost of transportation. But any such drawback or rebate was not allowed

[Munhall *v.* Pennsylvania Railroad Co.]

upon oil refined at Pittsburgh or vicinity from crude petroleum brought there in barges or boats *via* the Allegheny river. This general arrangement between the defendant companies, with some modifications in details, prevailed from the time it was entered into between the two roads, about 1870 or 1871, down to the trial of these cases.

The Allegheny Valley Railroad Company (like the bargemen on the river), carried crude oil from the oil regions to Pittsburgh at one uniform rate, without reference to the point at which it first reached the railroad. But it went a step further in competing with the rivermen. It carried crude oil to the refinery, and its manufactured product to Allegheny Junction, at one uniform rate. Pittsburgh refiners—all of them—were thus put in as good position, as if their refineries had been situate at Allegheny Junction. They had one uniform through rate on oil from the oil regions to the seaboard.

Parties shipping oil over the Allegheny Valley Railroad, received receipts showing the amount of freight paid. When they shipped their oil east, these receipts were accepted by the Pennsylvania Railroad Company, as evidence that the freight chargeable to the first part of the carriage had been paid, and that company collected only its own freight in money. If no such receipts were presented—if no freight had been paid for carriage between Pittsburgh and Allegheny Junction—it collected freight for the whole route.

In consequence of this arrangement, the plaintiffs alleged, that refiners of oil at Pittsburgh and vicinity, were compelled to and did desist from purchasing crude pretroleum brought to Pittsburgh or its vicinity, by barges or bulk boats *via* the Allegheny river, and thus the business of the plaintiffs was almost entirely broken up and destroyed.

The plaintiffs, to counteract the effect of the above-mentioned discrimination, lowered their rates of freight to 8 and 10 cents per barrel—a rate far below that charged by the Allegheny Valley Railroad Company, which was then about 35 cents per barrel—but without avail.

They further alleged that their former customers continued in the business of refining crude oil at Pittsburgh and vicinity, and were purchasers of crude petroleum, but that by reason of the above arrangement, they were compelled to withdraw their patronage from plaintiffs, and supply themselves with oil brought *via* the railroad.

The plaintiffs having closed their testimony, counsel for defendants move the court for judgment of peremptory nonsuit, for the following reasons:

1. No evidence has been given connecting the Pennsylvania Railroad Company, one of the defendants, with the combination

declared upon.    2. There is no evidence of any illegal combination for any purpose.    There is no evidence of any combination for an illegal purpose, and especially none from which the jury could find a malicious injury " to the plaintiffs in their business."    4. There is no evidence of an unlawful combination between the defendants for the purpose of, and resulting in, " actual legal damages " to the plaintiffs.

The court said : " We do not see how we could sustain a verdict for the plaintiff under the evidence, and, therefore, judgment of nonsuit granted with leave, &c."

This action of the court was assigned for error by plaintiffs, who took this writ.

*M. W. Acheson* and *D. T. Watson*, for plaintiffs in error.—The fact of conspiracy need not be proved, but may be collected from other circumstances.: Com. *v.* Corlies, 3 Brew. 579 ; and the concurring conduct of the defendants need not be proved : Whar. Crim. Law, sect. 2355 ; Com. *v.* Warren, 6 Mass. 74 ; Com. *v.* Crowninshield, 10 Pick. 497.    In the King *v.* Parsons et al., 1 W. Bl. 392, it was declared by Lord Mansfield, that there is no occasion to prove the actual fact of conspiracy, but it may be deduced from collateral circumstances.    See also Rex *v.* Murphy, 8 C. & P. 297.

Combination is criminal, when the act to be done has a necessary tendency to prejudice the public or oppress individuals : Com. *v.* Carlisle, Brightly Rep. 40 ; Com *v.* Tack, 1 Brew. 511 ; Com. *v.* Kilpatrick, 15 Leg. Int. 347.

Or when the act to be done necessarily tends to prejudice the public or oppress individuals, by unjustly subjecting them to the power of the confederates : Morris Run Coal Co. *v.* Barclay Coal Co. 18 P. F. Smith 174.    If the motives of the confederates be to oppress, the means they use unlawful, or the consequences to others injurious, their confederation will become a conspiracy : Id. 187.

On a railroad, up to its capacity to accommodate, equality must exist at the same rates of transportation, and as far as possible in accommodation : The Cumberland Valley Railroad Company's Appeal, 12 P. F. Smith 218 ; Twells *v.* Pennsylvania Railroad Co., 3 Am. Law Reg. (N. S.) 728 ; Sandford *v.* Railroad Co., 12 Harris 381.

The least degree of concert or collusion between parties to an illegal transaction, makes the act of one the act of all ; and the acts and declarations of one may be given in evidence to affect the others : Gibbs *v.* Neely, 7 Watts 305 ; Burns *v.* McCabe, 22 P. F. Smith 315 ; Confer *v.* McNeal, 24 Id. 112 ; 1 Greenl. on Ev., sect. 111 ; Bredin *v.* Bredin, 3 Barr 81.

The discrimination under this combination in favor of refined oil, the product of crude transported to the Pittsburgh refineries *via* the Allegheny Valley Railroad, and against refined oil, the

product of crude transported to these refineries *via* the Allegheny river, cannot be justified.    It is condemned by the decisions of this court in the cases cited.

The evidence also established indisputably that, in consequence of this combination between the defendant companies, and their united action in carrying out their system of unlawful discrimination, the plaintiffs, respectively, were seriously injured in their business.    The disastrous effect upon the plaintiffs was direct and immediate.

*Hampton & Dalzell*, for defendants in error.—Authority to enter into arrangements and contracts with other connecting carriers, for the purpose of providing through transportation, is an incident of railroad corporations, unless withheld by the terms of their charters: Perkins *v.* P. S. & P. Railroad Co., 47 Me. 573 ; Old Colony Railroad Co. *v.* Evans, 6 Gray 25.    And contracts of this kind, when made with a bona fide purpose to regulate traffic in a reasonable manner, are generally held good: 1 Redfield on Railw. 612 ; S. W. Railroad *v.* Redmond, 100 E. C. L. R. 674 ; Darling *v.* Boston and Worcester Railroad Co., 11 Allen 298 ; Gass *v.* N. Y., P. & B. Railroad Co., 99 Mass. 220.    Contracts between railroad companies for division of fares and freights are legal: Sussex Railroad Co. *v.* Morris and Essex Railroad Co., 4 C. E. Green 13.    The right of railroad corporations to divide through fares and freights on authorized lines, or to offer inducements by a reduction in rates to secure freights and travel over such lines, are contracts concerning their own authorized business, and not objectionable unless unconscionable: M. & E. Railroad Co. *v.* Sussex Railroad Co., 5 C. E. Green 543.    Such contracts are not only not *ultra vires*, but, on the contrary, it is the duty of a railroad company to increase its business by all usual and customary means: Stewart *v.* Erie and Western Railroad Co., 17 Minn. 390.

Contracts for through rates of freight and travel are not only usual and customary, but they are notoriously consistent with the railway policy of the whole country.    They are its basis and the means whereby our railroads, instead of being merely state, have become national highways.    Special rates may be made for special shippers, as a class, to secure business: Fitchburg Railroad Co. *v.* Gage et al., 12 Gray 399 ; Shipper *v.* Pennsylvania Railroad Co., 11 Wright 338 ; Hersh *v.* Northern Central Railway Co., 24 P. F. Smith 181.

This arrangement was not oppressive to the public.    It cheapened freights, and tended thus to build up the refining business of Pittsburgh.    The clearest proof of its beneficial effect is to be found in the fact that every refiner in Pittsburgh availed himself of its terms.    Instead of limiting the oil supply in the general market,

it increased it.　The defendants carried all the year round and without restriction as to quantity; the plaintiff could only carry during a portion of the year, and then only a limited quantity. The defendants are, therefore, within the test laid down by Tindal, C. J., in Horner v. Graves, 7 Bing. 735, cited by Agnew, C. J., in Morris Run Coal Co. v. Barclay Coal Co., 18 P. F. Smith 185. Declarations of one of two persons charged with combining or conspiring to defraud another, are not evidence against the absent party until evidence of the combination for the purpose charged be given: Helser v. McGrath, 8 P. F. Smith 458.　To make such declarations competent there must be primary evidence of a collusive combination for a common purpose: McDowell v. Rissel, 1 Wright 164; Scott v. Baker, Id. 330; Scott v. Heilager, 2 Harris 238.

And evidence that each one of the alleged conspirators acted illegally, will not support the action without evidence that they conspired to do the illegal act: Newall v. Jenkins, 2 Casey 159; Gaunce v. Backhouse et al., 1 Wright 350.

Mr. Justice Mercur delivered the opinion of the court, January 5th 1880.

These two cases were argued together.　They involve the same questions.　The court below ordered a compulsory nonsuit in each case, and refused to take off the judgments.

They are actions on the case against the defendants for conspiracy and injury to the plaintiffs respectively, in their business. The latter were engaged in the transportation of crude oil, in boats and barges down the Allegheny river, from the oil regions of Pennsylvania to Pittsburgh.　The Allegheny Valley Railroad Company was engaged in transporting it by rail.　The crude oil was brought to Pittsburgh by both modes, principally for the purpose of being there refined, and then sent to the seaboard for market.　Competition was thus created.　The railroad company had some advantages over the bargemen.　At some seasons of the year there was an insufficiency of water in the river, at others it was frozen.　The railroad could carry at all times.　At first the crude oil was carried in barrels.　As the quantity largely increased, tanks were substituted.　This made transportation by railroad more desirable, and gave it an additional advantage.

The cause of complaint is, that the Allegheny Valley Railroad Company entered into an arrangement with the Pennsylvania Railroad Company, the effect of which was to take from the plaintiffs that transportation of oil which they otherwise would have obtained. It is not complained that the price of freight from Pittsburgh east was increased by this arrangement, nor that the public in any manner suffered thereby.

Each party had an undoubted right to enter into a just and fair

arrangement with a corporation or association of men, whereby its business should be increased, although the effect of the arrangement may have been to take business from the other. Either party, with a view of increasing its business, may extend more favorable terms to all shippers, although others engaged in the same business may incidentally be injured thereby. The fact that the public patronize those lines of transportation which give the most favorable terms, constitutes no just ground of complaint. What then are the facts? It is shown that each party carried crude oil from any point at which it was taken, to Pittsburgh and its vicinity, at one rate, without regard to the distance; and that refiners had a uniform through rate for refined oil to the seaboard *via* Allegheny Valley and Pennsylvania Railroads from any given point where the crude oil first reached the former road. The Allegheny Valley Road crosses the Western Pennsylvania Railroad at Allegheny Junction, and by means of the latter road connects with the main line of the Pennsylvania Railroad. In order to more successfully compete with the river transportation, the Allegheny Valley Road carried crude oil to the refinery at Pittsburgh, and its manufactured product to Allegheny Junction at one uniform rate, thus giving to all the refiners at Pittsburgh as favorable terms as if their refineries had been located at Allegheny Junction. They had one uniform rate on oil from the oil regions to the seaboard. We are unable to discover anything unjust or unfair in this. To deny this right to the Allegheny Valley Road would be an unwarranted interference with the management of its business, and would deprive the public of the benefit of the competition to which it is justly entitled.

Then as to the action of the Pennsylvania Railroad Company, in the transportation of refined oil from Pittsburgh east. It was carried over the road of each company. Each was entitled to and received its share of the money thus earned. The fact that it was first all paid to one and afterwards adjusted between them, gives the plaintiffs no right to complain. These two companies had the right either for their own convenience or for the convenience of the refiners and shippers to require the whole freight on refined oil to be paid to the one that first carried it. The right of connecting railroad corporations to make contracts for through rates, is incident to their powers unless prohibited by their charters. 1 Redf. on Railways, sec. 146 : Perkins *v.* P. S. and P. Railroad Co , 47 Maine 573; Sussex Railroad Co. *v.* Morris and Essex Railroad Co., 4 C. E. Green 13; M. & E. Railroad Co. *v.* Sussex Railroad Co., 5 Id. 543. In the present case the right was not prohibited. It was exercised in a just and reasonable manner. It was not unconscionable. The Pennsylvania Railroad Company carried refined oil at no different rate, whether it was the product of crude oil brought to Pittsburgh by rail or by water. The same

rate was charged to each. The mode of receiving its pay was different. That carried by water paid in money only; that by rail partly in receipts showing money already paid. This was no rebate. It was no unjust discrimination. Neither company received any share of the other's earnings. Each received its own. We see nothing unjust or unequitable in the arrangement proved on the part of either of the defendants. It is not a restraint on trade, as in Morris Coal Company *v.* Barclay Coal Company, 18 P. F. Smith 173; nor does it come within the principle condemned in Twells *v.* Penn. Railroad Co., 3 Am. Law Reg. (N. S.) 728. If the plaintiffs suffered thereby it is an incident often occurring to persons engaged in transportation, as new modes are adopted and reduced rates thereby established. Neither corporations nor individuals ought to be denied all reasonable benefits which flow from the active competition of trade.

Having the right to adopt rates lower than crude oil could be carried in barges, the fact that the president of the railroad company expressed an intention of driving all the business away from the barges, cannot change the case. His object was to secure freight for his road. The fact that he foresaw the result of his efforts in so doing, and also declared it, matters not. Neither he nor the company which he represented was thereby compelled to relax all just and reasonable methods to increase the business of the road. It is unnecessary to refer specifically to other matters discussed. In view of the whole evidence, and the questions of law arising thereon, the learned judge committed no error.

Judgment affirmed in each case.