# Hersh, who survived Hough, *versus* The Northern Central Railway Co.

1. By an Act of Assembly it was provided that "rates for toll and transportation may be regulated in such manner as the company may deem most advisable; provided that the maximum charges for toll and transportation shall not exceed four cents per ton per mile for freight." A subsequent act amended the proviso so as to read "average charges for toll and transportation." *Held*, that the company might impose more than four cents per mile on some charges, so that by making others less the general average should not exceed four cents.

2. The adjustment of tolls was not required to be made so as to bear equally on each individual, but was to be made between the whole road and the entire public who used it.

3. The requirement of the statute is filled by fixing different charges per mile for different kinds of freight.

[Hersh *v.* Northern Central Railway Co.]

4. The company may discriminate in favor of longer distances.

5. "Average charges" are charges at a mean rate, ascertained by dividing the entire receipts by the whole quantity of tonnage, reduced to a common standard of tons moved one mile.

6. The charges against the plaintiff, averaged by the whole amount of business of the company, was less the 4 per cent; by that done for him alone they were more than 5 per cent. *Held,* that the former was the proper estimate and that the charges were not excessive.

May 27th 1874.    Before READ, C. J., AGNEW, SHARSWOOD, WILLIAMS and MERCUR, JJ.

Error to the Court of Common Pleas of *Lancaster* county: Of May Term 1873, No. 63.

This was an action of assumpsit, brought August 15th 1866, by Edward Hersh, who survived John Hough, trading as Hough & Hersh, against the Northern Central Railway Company.

The suit was originally brought in the Court of Common Pleas of York county; and under the 1st section of the Act of April 14th 1834, Pamph. L. 395, 2 Brightly's Purd. 1227, pl. 72, it was removed on the 23d of January 1869, to the Court of Common Pleas of Lancaster county.

The suit was brought to recover back tolls, &c., paid by the partners to the defendants alleged to be in excess of the rates allowed by law.

In Lancaster county it was referred, under the 3d section of the Act of June 16th 1836, Pamph. L. 717, 1 Brightly's Purd. 78, pl. 4, to George M. Kline, Amos Slaymaker and William Leaman, Esqs., reserving matters of law arising for the decision of the court; the report of the referees to have the same effect as a special verdict.

The referees found the following facts amongst others :—

"The partners had been engaged in the business of mining coal, in Northumberland county, from 1860 to November 1865, as lessees of the Susquehanna Coal and Coal Mountain Company.

The Northern Central Railway Company, the defendant, is lessee of the Shamokin Valley and Pottsville Railroad, under a lease executed by the Shamokin Valley and Pottsville Railroad Company on the 27th day of February 1863.

The road so leased extends from Mt. Carmel to Sunbury, a distance of twenty-eight miles, and was originally built from Sunbury to the town of Shamokin by the Danville and Pottsville Railroad Company, incorporated April 8th 1826.    Under the supplements to the charter of the Danville and Pottsville Railroad Company, a branch road was subsequently built, about the year 1855, to Mt. Carmel, a distance of about eight miles.

In the year ——, the Locust Gap Improvement Company constructed a lateral railroad upon the lands lying east of the Shamokin Valley and Pottsville Railroad from their colliery to the line of the said railroad, connecting therewith at a point called Locust

Gap Intersection. " The said lateral railroad extended about fifty feet over the lands of the said Locust Gap Improvement Company," and the residue of its length over the lands of the Susquehanna Coal and Coal Mountain Company, across which a right of way had been granted.

At the time of the construction of the said lateral railroad there was no connection therewith eastwardly, but in that year the Mine Hill and Schuylkill Haven Railroad, was extended so as to form a junction with the said lateral railroad at its eastern terminus near the collieries of the said Locust Gap Improvement Company, making a continuous line of railroad communication from Locust Gap Intersection to Philadelphia.

The colliery of the plaintiffs was situated on the line of the Shamokin Valley and Pottsville Railroad west of Mt. Carmel, and distant from Locust Gap Intersection about 1¾ miles, or 9231 feet. It was opened about 1854, and the breaker thereof erected in 1854 or 1855.

From February 27th 1863, to ———, the plaintiffs shipped over the road, so leased to the defendant, coal from the said colliery as follows, to wit :

To Locust Gay Intersection, 1¾ miles (or 9231ft.) 61,540,03 tons.
" Shamokin Furnace,         7  "     .    .       2,860,19 "
" Sunbury,                 26  "     .    .      10,588,09 "
    *        *       *       *       *       *       *

The shipments of coal to Locust Gap Intersection and Sunbury were in transit to markets beyond those points, being carried on the cars of the Philadelphia and Reading Railroad Company and the Schuylkill Navigation Company for the eastern market by way of Locust Gap Intersection, and in cars owned by the Northern Central Railway Company, or cars furnished by it, for the western market by way of Sunbury.

The Northern Central Railway Company never supplied any cars for transporting coal from the collieries about Shamokin and Mt. Carmel to the eastern markets.

The Philadelphia and Reading Railroad Company delivered the cars for that traffic at Locust Gap Intersection on sidings prepared for the purpose. Thence they were taken by the Northern Central Railway Company, distributed to the various collieries in allotments designated by the Philadelphia and Reading Railroad Company, and, after loading, returned to the Philadelphia and Reading Railroad Company at Locust Gap Intersection. * * *

For the shipments of coal above specified, the plaintiffs paid to the defendants, as follows, viz. :—

For 61,540,00 tons gr. to Locust Gap Intersection, $15,746.84
"     2,860,19      "   " Shamokin Furnace,   .        809.15
"    10,588,09      "   " Sunbury,         .    .     8,015.88

[Hersh *v.* Northern Central Railway Co.]

The defendant carried merchandise, &c., from Sunbury to Mt. Carmel for the plaintiffs, and received therefor, as follows:—

| | | | | |
|---|---|---|---|---|
| 1863—184,572 lbs., | . | . | Amount paid | $170.01 |
| 1864—160,902 " | . | . | "        " | 198.33 |
| 1865— 27,274 " | . | . | "        " | 37.05 |

372,748 (or 186⅓ tons.)    Amount paid $405.39

The rates for charges for toll and transportation between different points on the Shamokin Valley and Pottsville Railroads were fixed by the general superintendent of the Northern Central Railway, residing at Harrisburg.

The rates so fixed were published on "toll-sheets," which were posted in the offices of the company at the various stations. The operators were notified of these rates by letter or printed circular.

The rates were charged for shipments made after the date of their going into effect, and till altered by the general superintendent.

In accordance with the toll-sheets, the bills for coal transported were made out by the agents at the various stations, from returns of tonnage received from the weigh-masters, and presented for payment to the operators.

The bills were for coal shipped prior to their presentation, and after the service of the company had been rendered.

Bills were made out and presented monthly, or semi-monthly, to the plaintiffs, by W. P. Withington, agent at Shamokin station, in the years 1863, 1864 and 1865.

He sent the bills to the plaintiffs at Mt. Carmel, who returned them to the agent with their check. The bills were then again forwarded to the plaintiffs receipted.

The following rates per ton for freights, from the plaintiffs' colliery to Locust Gap Intersection, appear on the "toll-sheets" of the following dates, viz.:—

| | | | | | |
|---|---|---|---|---|---|
| April 13th 1863, | . | . | 23 cts. | per ton. |
| Sept.  1st 1863, | . | . | 23 " | " |
| Feb.   1st 1864, | . | . | 23 " | " |
| May  16th 1864, | . | . | 28 " | " |
| Sept.  1st 1864, | . | . | 32 " | " |
| June  1st 1865, | . | . | 28 " | " |
| Oct.   1st 1865, | . | . | 32 " | " |

It is usual for railroad companies to charge higher rates for transporting freights short than long distances, for the reason, that the number of men employed, the time consumed, and the incidental expenses incurred, are proportionally greater.

The rates and charges for tolls and transportation on the Shamokin Valley and Pottsville Railroad were established under the provisions of Acts of Assembly.

The third section of an act supplementary to an act entitled "An Act incorporating the 'Danville and Pottsville Railroad Company,'" approved April 11th 1848, provides :—

"That the rates for toll and transportation may be fixed and regulated in such manner as the company may deem most advisable : Provided, however, That the maximum charges for toll and transportation on the said road shall not exceed four cents per ton per mile for freight." (Pamph. L. 1848, 541.)

The second section of an act supplementary to an act, entitled "An Act to incorporate the Danville and Pottsville Railroad Company," approved April 2d 1850, provides :—

"That the proviso to the third section of the said act be and the same is hereby amended so as to read, 'Average charges for toll and transportation,' instead of the 'maximum charges.'" (Pamph. L. 1850, 298.)

Average charges for toll and transportation, when the rates per ton per mile are not uniform for all distances which freights may be carried, are understood by those engaged in the operation and superintendence of railroads in the state of Pennsylvania, and familiar with making out "toll-sheets" and rates of charges, to signify charges made at a mean rate, obtained by dividing the entire receipts for toll and transportation by the whole quantity of tonnage carried, reduced to a common standard of tons moved one mile.

An example will make clear the meaning and method of reaching an "average rate."

Given a road thirty miles in length, and let the rates per ton per mile vary for different distances, to wit : for ten miles, ten cents per ton per mile; for twenty miles, four cents per ton per mile ; for thirty miles, two cents per ton per mile. At the said rates, let ten tons be carried ten miles, producing ten dollars ; and ten tons twenty miles, producing eight dollars ; and ten tons thirty miles, producing six dollars ; making the entire receipts for toll and transportation twenty-four dollars. The carriage of ten tons ten miles equals that of one hundred tons one mile ; the carriage of ten tons twenty miles equals that of two hundred tons one mile ; the carriage of ten tons thirty miles equals that of three hundred tons one mile. The whole tonnage carried, thus reduced to the common standard of tons moved one mile, by multiplying the number of tons by the number of miles the tons are transported, is equal to the carriage of six hundred tons one mile. Dividing the twenty-four dollars by the six hundred tons, we attain the average rate per ton per mile, viz. : four cents per ton per mile.

The "average charges for toll and transportation" on the Shamokin Valley and Pottsville Railroad, leased to the defendant, obtained by dividing the entire receipts for freights thereon, from

[Hersh *v.* Northern Central Railway Co.]

February 1st 1863 to December 31st 1865, by the whole tonnage carried during that period, reduced to the standard of tons moved one mile, were 3.734 cents per ton per mile.

The operators paid the company for the use of its road, four cents per ton per mile for the coal carried for them, and three cents per ton for weighing the same. Owners of cars were paid for the use of their cars, and owners of teams were separately paid a specified sum per ton per mile for hauling. On the Philadelphia and Columbia Railroad, constructed by the state of Pennsylvania and operated by it from the year 1834 to the year 1857, the state furnished the road-way and the motive-power, but had nothing to do with the transportation. Transportation was the term applied to the business of those individuals who supplied the cars and train-hands. These individuals were called "transporters," who transported all freights received by them. The receipts for the use of the roadway were known as "tolls," and were kept distinct from the receipts for "motive-power."

The present acceptation of the word transportation includes all that was done by both the state and transporters, in all cases where the entire services are rendered by the railroad company. * * *

The aggregate sum paid by the plaintiffs to the defendant for toll and transportation on shipments of coal from the plaintiffs' colliery to Locust Gap Intersection, in excess of charges at the rate of four cents per ton per mile, amounted, on November 15th 1865, to eleven thousand four hundred and thirty-four dollars and eighty-seven cents.

The plaintiffs paid to the defendant, for toll and transportation, in excess of charges made, at the maximum rate of four cents per mile on merchandise, carried by the defendant for the plaintiffs, from Sunbury to Mt. Carmel, as follows, viz. :—

| | |
|---|---|
| In the year 1863, . . . . . | $74.03 |
| " " 1864, . . . . . | 114.66 |
| " " 1865, . . . . . | 22.87 |

The average charges for toll and transportation made by the defendant, for coal and merchandise shipped by the plaintiffs over the road of the defendant, from February 1st 1863 to December 31st 1865, obtained by dividing the entire receipts for freight from the plaintiffs by the whole tonnage carried for the plaintiffs, reduced to the common standard of tons moved one mile, were 5 837-1000th cents per ton per mile; giving December 31st 1865 on all the freights transported for the plaintiffs, a total sum, in excess of charges, calculated at the rate of four cents per ton per mile, of $7492.21."

On the 2d of January 1873, the report of the referees was filed, and on the same day the plaintiffs moved the court to enter judgment in their favor on the report for $16,627.48, being the

[Hersh *v.* Northern Central Railway Co.]

amount of the excess in charges as found by the referees on the basis last mentioned in their report, and interest from January 1866, seven years."

The defendants on the same day moved to enter judgment in their favor.

On the 17th of March 1873, the court delivered their opinion, in which, after considering whether transportation included furnishing cars, &c., they said:—

"We do not, however, clearly perceive the materiality of these distinctions, if it appear that they charged the plaintiffs for toll and transportation not more than four cents per ton per mile, which it is alleged by them was the fact. In contradiction to this, the plaintiffs exhibit the toll-sheets, showing that from their colliery to the Locust Gap Intersection, which is but 1¾ miles, the charges ranged from twenty-three to twenty-eight and thirty-two cents per ton, as if this was a violation of the act limiting the charge to four cents per mile; and so it would have been, had not the law been changed. The Act of the 11th of April 1848, entitled 'An Act incorporating the Pottsville and Danville Railroad Company,' provided that the *maximum* charges for toll and transportation, on the said road, shall not exceed four cents per ton per mile for freight. Two years afterward this proviso was modified by the second section of the supplement to the said act, by declaring that the proviso should be amended so as to read, 'average charges for toll and transportation,' instead of 'the maximum charges.' If this change has any meaning, it warrants more than the *maximum* charge of four cents per mile per ton, on parts of the road, if on the whole route of their road the toll and transportation charged to the customer do not *average* more than four cents per ton per mile. The question was much discussed, what is an average charge for toll and transportation on this railroad? We think it right and proper to take the explanation of the term, 'average' as reported by the referees and deduced by them from the testimony of witnesses in regard to the common and current acceptation of the phrase among railroad men, and as consonant with reason also; and we consider that applying it as thus explained, the defendant's position is sustained, that their average charges in this case were not more than four cents per mile per ton, for toll and transportation for the plaintiffs' coal and merchandise."* * *

Judgment was entered on the report of the referees for the defendants.

The Acts of Assembly involved in the case are stated in the opinion of Judge Mercur.

The plaintiffs removed the record to the Supreme Court. They assigned four errors; the second was:—

In deciding that the average charges in this case were not more

[Hersh *v.* Northern Central Railway Co.]

than four cents per mile per ton, for toll and transportation for the plaintiffs' coal and merchandise.

*J. L. Mayer* and *Black* (with whom were *P. D. Baker* and *T. E. Franklin*), for plaintiffs in error.

*J. B. Packer* and *W. MacVeagh* (with whom were *P. L. Wickes, S. H. Reynolds* and *O. J. Dickey*), for defendants in error.

The opinion of the court was delivered, July 2d 1873, by

MERCUR, J.—The most important question in this case arises under the second assignment of error. It alleges " the court erred in deciding that the average charges in this case were not more than four cents per mile per ton for toll and transportation for the plaintiffs' coal and merchandise."

Strictly speaking, this raises a question of fact only. Inasmuch, however, as the facts were found by the referees, under an agreement of the parties that they should " have the same effect ·as a special verdict," we will consider whether the court decided the law correctly upon the facts found by the referees. As much of the argument has been directed towards the consideration of the meaning of " average charges," a reference to the legislation bearing upon it becomes necessary. The Danville and Pottsville Railroad Company was incorporated by Act of April 8th 1826. Under this act the road was constructed from Sunbury eastwardly to Shamokin, a distance of about twenty miles. By the Act of April 8th 1834, the credit of the state was pledged for the payment of the interest upon the loan certificates of said company, to the amount of $300,000, which were duly issued. The company became insolvent. The several Acts of 21st April 1846, March 16th 1847 and April 11th 1848, were passed, making provision for the sale of the road and the franchises of the company upon terms therein specified. No sale having been made, the further supplement of April 2d 1850 was passed. It recited that the " state had already paid the sum of $225,000, and that there was no reasonable prospect that the company would ever complete the said railroad and relieve the state from the annual drain of $15,000 from her treasury."

Under these laws a sale was finally effected in 1850. By Act of April 12th 1851, the sale was confirmed, and the name of the corporation changed to the Philadelphia and Sunbury Railroad Company. This company repaired the part of the road already built, and in 1855 constructed a branch road from Shamokin eastwardly to Mt. Carmel, a distance of about eight miles. In November 1857 the road and franchises were sold at sheriff's sale upon a mortgage executed by said company under an act of the

legislature.  The sale was confirmed by Act of 25th March 1858, and the purchasers duly incorporated under the name of the Shamokin Valley and Pottsville Railroad Company.  This last-named company operated the road until 27th February 1863, at which time they leased it to the defendants for a term of years.

The Act of April 8th 1826 fixed the charges for tolls and transportation at prices varying from one and a half to four cents per ton per mile.  The third section of the aforesaid Act of April 11th 1848 (Pamph. L. 1848, p. 541) provided " that the rates for toll and transportation may be fixed and regulated in such manner as the company may deem most advisable: Provided, however, that the maximum charges for toll and transportation on the said road shall not exceed four cents per ton per mile for freight."  The second section of the supplement, approved April 2d 1850 (Pamph. L. 1850, p. 298) declares that the " proviso to the third section of said act be and the same is hereby amended so as to read ' average charges for toll and transportation,' instead of ' the maximum charges.'"

It is thus shown that at the time of the passage of the several acts relating to the sale of the road, prior to the Act of April 2d 1850, the maximum charges which the company was authorized to make was four cents per mile per ton.  No greater charge than four cents per ton for any mile could be imposed.  Beyond that sum the company could not go.  The law made that the barrier which could not be passed.  Under that limitation and restriction no purchaser was procured.  What, then, was the object of the Act of 2d April 1850 ?  Was it to give more or less favorable terms to the company and to the purchaser ?  The desire to facilitate a sale having been unmistakably expressed by the legislature, the reasonable presumption is that it was to offer more inviting terms to a purchaser.  It is contended, on the part of the plaintiff, that this law only gave power to make average charges below the four cents per mile.  We answer, the company had that power before its passage; so we will not give to the statute such a construction as will wholly prevent its taking effect.  The maximum charge was the only limitation imposed by the previous law.  Below that sum the company could have made such average charges as it " deemed most advisable."  The undoubted intention of the act, therefore, was to authorize the company, by a wise and judicious discrimination, to impose some charges higher than four cents per mile ; but, by putting others less, to so adjust the whole that the general average should not exceed that sum.

The referees have found that the average charges for toll and transportation upon this road, during the time in question, was only 3.734-1000th per mile per ton.  Objection is made to this conclusion for two reasons ; first, because the referees considered

[Hersh *v.* Northern Central Railway Co.]

the whole tonnage carried and not the plaintiffs' alone; and secondly, because of the much higher rates charged for short distances than over the whole road. We do not think either of these objections is sound. There is nothing in the act requiring that this adjustment should be so made as to bear equally upon each individual without regard to kind of freight or distance.

The adjustment is to be made between the whole road and the entire public who use it. Full effect is therefore given to the spirit and intent of the statute, as well as to its letter, by fixing different charges per mile for different kinds of freight. Such is the custom of all railroads. Nor is there anything unjust in discriminating in favor of longer distances. The referees have found it usual for railroad companies to charge higher rates for transporting freight short than long distances, for the reason that the number of men employed, the time consumed and the incidental expenses incurred are proportionately greater. Strong reasons exist in this case for the application of that rule. The freight of the plaintiffs was passed over one and three-fourths miles only of the defendants' road, while the motive-power of the company had to be moved up a heavy grade to reach that portion of the road. The plaintiffs cannot be permitted to separate their freight entirely from that of others in determining the gross average charges received by the defendants. We therefore agree with the finding that when the rates per ton per mile are not uniform for all distances for which freights may be carried, "average charges for toll and transportation" are understood to mean, and do mean, charges made at a mean rate, obtained by dividing the entire receipts for toll and transportation by the whole quantity of tonnage carried, reduced to a common standard of tons moved one mile. It is true, this must be applied to some given time, but the finding shows that whether each year be considered separately or the whole time together, during which the tonnage of the plaintiffs was passing over the road, the average charges of the defendants did not exceed four cents per ton per mile for the whole tonnage.

This view of the case shows the judgment was correctly entered in favor of the defendants. It is therefore unnecessary to discuss the other assignments of error, as none of them can change the result.                                Judgment affirmed.