The Bald Eagle Valley Railroad Company and the Pennsylvania Railroad Company, in its own right and in its right as lessee of the Bald Eagle Valley Railroad, Appellants, *v.* The Nittany Valley Railroad Company, The Valentine Iron Company, their and each of their officers, and J. W. Gephart, individually and as president of the Valentine Iron Company.

*Contract— Consideration—Agreement to give traffic to railroad.*

An agreement between a corporation owning ore lands and a furnace, to give all its traffic to a railroad company in consideration of the latter subscribing to the bonds of the corporation, is based upon a sufficient consideration.

*Contract— Covenant running with land—Affirmance of contract—Equity.*

Where a corporation owning a furnace and ore lands covenants for itself, its successors and assigns, in the nature of a covenant to run with the land, to give all its traffic to a railroad company in consideration of the latter's subscribing to its bonds, and the property of the corporation is subsequently sold under a mortgage prior in date to the contract to the bondholders who organize a new iron company, which affirms the contract and accepts all the benefits of it for two years, equity will restrain the new company from diverting its traffic from said railroad to another. And the fact that the affirmance of a traffic contract touching land rests in parol, will not prevent the interposition of equitable principles even where the contract postdated a lien through which the defendant claimed title.

*Constitutional law—Contract—Agreement to give traffic to a railroad— Constitution of 1874, art. XVII. secs. 1, 3 and 4.*

There is nothing in sections 1, 3 and 4 of art. XVII. of the constitution of 1874 which will render void an agreement by a corporation owning a furnace and ore lands to give all its traffic to a railroad company, in consideration of the latter subscribing to its bonds.

*Railroads—Agreement with connecting lines—Parallel lines—Agreement with special classes of shippers—Act of April 23, 1861.*

A railroad company has a right to make a special traffic contract with a connecting railroad which is not parallel or competing; and it may also make such a contract with a special class of shippers to secure business.

*Equity—Injunction—Specific performance.*

On a bill in equity where it appears that the defendant, a furnace company, has agreed for a sufficient consideration to give all of its traffic to the plaintiff, a railroad company, the court will decree specific performance of the contract, but will not enjoin the officers of the defendant com-

pany from participation in the construction of a railroad parallel to that of the plaintiff, and to which, the plaintiff alleges the defendant's traffic was to be given.

Argued April 25, 1895.   Appeal, No. 171, Jan. T., 1895, by plaintiff, from decree of C. P. Centre Co., Nov. T., 1893, No. 55, on bill in equity.   Before STERRETT, C. J., GREEN, MITCHELL, DEAN and FELL, JJ.   Reversed.

Bill in equity for an injunction, and for specific performance.   Before FURST, P. J.

The facts appear by the opinion of the Supreme Court.

The prayers of the bill were as follows :

First.  That your honors grant a writ of injunction, preliminary until hearing and perpetual thereafter, restraining the Nittany Valley Railroad Company and the Valentine Iron Company, their and each of their officers, agents and employees from committing any act or acts in aid or encouragement of the organization or establishment of the Central Pennsylvania Railroad Company, or of the construction or completion of any line or lines of railroad owned, operated or controlled by the said The Central Pennsylvania Railroad Company or by any other company or person or persons within the territory embraced within the charter of the said The Central Pennsylvania Railroad Company, and generally from committing any act or acts in aid or encouragement in any manner of the construction of any line or lines of railroad competitive with the lines of railroad owned, operated and controlled by the Bald Eagle Valley Railroad Company and the Pennsylvania Railroad Company within the territory embraced within a certain agreement, dated the 22d day of March, A. D. 1887, and recorded in the office for the recording of deeds, etc., in and for the county of Centre, in the state of Pennsylvania, in miscellaneous book H, page 641, etc. ; also further restraining J. W. Gephart, so long as he remains president of the said The Valentine Iron Company, or in any manner connected therewith or pecuniarily interested therein, from acting as superintendent of construction of the said The Central Pennsylvania Railroad Company, and from acting in any other capacity in the employ of or connected with said company or connected with the construction or completion of any line or lines of railroad owned, operated or controlled

by the said The Central Pennsylvania Railroad Company, or by any other company or person or persons within the territory embraced within the charter of the said The Central Pennsylvania Railroad Company, and generally from committing any act or acts in aid or encouragement in any manner of the construction of any line or lines of railroad competitive with the lines of railroad owned, operated and controlled by the Bald Eagle Valley Railroad Company and the Pennsylvania Railroad Company within the territory embraced within the said agreement above mentioned, and also further restraining the said The Nittany Valley Railroad Company, the said The Valentine Iron Company, their and each of their officers, agents and employees, and the said J. W. Gephart from giving any traffic coming from or going to points upon the railroad of the said The Nittany Valley Railroad Company, or coming to or going from the property, mines and furnace owned and controlled or that may be built and operated by the said The Valentine Iron Company, mentioned in the said agreement to the said The Central Pennsylvania Railroad Company, or to any other company, person, or persons than the said The Bald Eagle Valley Railroad and the said The Pennsylvania Railroad Company.

Second. That your honors decree the specific performance of the above mentioned agreement by the defendants in this bill, especially ordering and directing that they, and each of them, shall give all the traffic coming from or going to points upon the railroad of the said The Nittany Valley Railroad Company, or coming to and going from the property, mines and furnace or furnaces mentioned in the first prayer of this bill to your orators, their successors and assigns, for transportation over the said The Bald Eagle Valley Railroad, and over the lines owned, operated and controlled by your orators, in going to and coming from point of destination or shipment, so far as the said lines of your orators may be available therefor, so long as the covenants of the said agreement are observed and performed as heretofore and at present by your orators.

Third. That your orators may have such further order and relief as the nature and circumstances of the case may require and as to your honorable court may seem meet.

Defendants demurred to the bill on nine grounds which are fully stated in the opinion of the Supreme Court.

The court sustained the demurrer and entered a decree dismissing the bill.

*Errors assigned* were, (1) in holding that the Valentine Iron Company did not sustain either privity of contract or estate with the covenantors or covenantees in the traffic agreement of March 22, 1887, and that the plaintiffs were strangers in title to the land owned by the Valentine Iron Company; (2) in holding the covenant to give traffic contained in said agreement invalid for want of consideration, and in holding that good and valuable considerations did not exist; (3) in not holding that the twenty-sixth paragraph of the bill contains averments sufficiently setting forth such affirmance and ratification of said agreement by the above-named defendants, after the sheriff's sale in said paragraph mentioned, as render said agreement binding upon said defendants, notwithstanding the fact that the mortgage in foreclosure of which said sheriff's sale was had antedated said agreement; (4) in holding that said covenant to give traffic is not a covenant running with the land; (5) in holding that said agreement offends against the constitution of Pennsylvania, article XVII., section 1; (6) in holding that said agreement offends against said constitution, article XVII., section 3; (7) in holding that said agreement offends against said constitution, article XVII., section 4; (8) in holding that said agreement is ultra vires; (9) in holding that said agreement is void as against public policy and as favoring monopoly; (10) in holding that said agreement is void as being in restraint of trade; (11) in holding that said agreement is void; (12) in holding, in view of the pleadings in this case, that said agreement was divested by the sheriff's sale of the land in foreclosure of said mortgage; (13) in holding in any event that the Nittany Valley Railroad Company is released from said agreement; (14) in sustaining the defendant's demurrer and in dismissing the plaintiff's bill with costs; (15) in not granting the relief prayed for in the plaintiff's bill (16) in not ordering the defendants to answer, inasmuch as the bill presented a case for the specific performance of a contract which was not otherwise the subject of adequate remedy at law.

*John Blanchard* and *David W. Sellers*, for appellants.—The court erred in holding that the Valentine Iron Company does not sustain either privity of contract or estate with the covenantors or covenantees in the agreement of March 22, 1887, and that the plaintiffs are strangers in title to the lands owned by the Valentine Iron Company : Masury v. Southworth, 9 Ohio 340 ; Bradford Oil Co. v. Blair, 113 Pa. 83 ; Rawle on Covenants, chap. 10, sec. 203 ; Prior's Case, Year Book, 42 Edw. III. 3, pl. 14 ; Norcross v. James, 140 Mass. 188 ; Bronson v. Coffin, 108 Mass. 175 ; Savage v. Mason, 3 Cush. 500 ; Spencer's Case, 1 Smith's Leading Cases, 215 ; Horn v. Miller, 136 Pa. 640 ; Webb v. Imp. Co., 161 Pa. 623 ; Tulk v. Moxhay, 2 Phill. 774 ; Luker v. Dennis, 7 Ch. D. 227 ; Pollard v. Shaffer, 1 Dallas, 210 ; Church v. Ruland, 64 Pa. 432 ; Com. v. Turnpike Co., 153 Pa. 47 ; Coleman v. Coleman, 19 Pa. 101 ; 4 Kent's Com. secs. 160, 165, 166 ; Sharswood's Bl. Com. 14, note 1 ; Lovelace v. Webb, 62 Ala. 271 ; Noyes v. Rich, 52 Me. 115 ; R. R. v. Express Co., 81 Ill. 534 ; Wooley v. Holt, 14 Bush, 788 ; Wooten v. Billinger, 17 Fla. 289 ; Pargeter v. Harris, 7 Q. B. 708 ; Thornton v. Court, 17 Eng. L. &. E. 213 ; Mayor of Carlisle v. Blanyre, 8 East, 487 ; 1 Sm. L. C., 6th Am. ed. 186, 843 ; White v. Whitney, 3 Met. 81 ; Astor v. Hoyt, 5 Wend. 603 ; Walton v. Cronly, 14 Wend. 63 ; Baldwin v. Walker, 21 Conn. 168 ; Calvert v. Bradley, 16 Howard (U. S.), 580.

The court erred in holding that the covenant to give traffic, contained in said agreement, is invalid for want of consideration, and in holding that a good and valuable consideration did not exist : Turnpike Co. v. Arndt, 31 Pa. 317 ; Pittsburg R. R. v. Stewart, 41 Pa. 55 ; Caley v. Chester R. R., 80 Pa. 363 ; R. R. Co. v. Haldeman, 82 Pa. 43 ; R. R. v. Woelpper, 64 Pa. 366.

The court erred in holding that said agreement offends against constitution, article XVII. section 4 : Hoover v. Penna. R. R., 156 Pa. 220 ; Munhall v. R. R., 92 Pa. 150.

All contracts held void as in restraint of trade disable production and labor in some form, or exclude the public from a fair market. All others are valid which show the intent is to do business and increase trade and where the restraint is for a value given that trade may be done : Gompers v. Rochester, 56 Pa. 194 ; Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. 173.

The court erred in holding in any event that the Nittany Valley Railroad Company is released from said agreement: St. Louis R. R. v. Penna. R. R., 145 U. S. 394.

The court should have ordered the defendants to answer inasmuch as the bill presented a case for the specific performance of a contract which was not otherwise the subject of an adequate remedy at law: Cuddee v. Rutter, 1 Leading Cases in Equity, 653; Penna. R. R. v. Terre Haute R. R., 118 U. S. 290.

*C. M. Clement* and *Ellis L. Orvis*, *Calvin M. Bower* with them, for appellees.—The Valentine Iron Company took the land and premises under the proceedings in foreclosure or mortgage free and discharged from all and every covenant and obligation of the agreement: Woods v. Farmere, 7 Watts, 382; McCormick v. MacMurtrie, 4 Watts, 192; Jaques v. Weeks, 7 Watts, 261; McCall v. Lenox, 9 S. & R. 302: Bury v. Sieber, 5 Pa. 431; Clark v. Stanley, 10 Pa. 472; Coulter v. Philips, 20 Pa. 154; De Haven v. Landell, 31 Pa. 120; Lance v. Gorman, 27 W. N. C. 45; Moore v. Little Rock, 42 Ark. 66; Dickinson v. White, 64 Iowa, 708; Sands v. Pfeiffer, 10 Cal. 258; Gardner v. Finley, 19 Barb. (N. Y.) 317; Preston v. Briggs, 16 Vt. 124; Jones on Mortg. vol. 1, section 428, etc.

The purchasers of the land having taken the same discharged from liability under the agreement, every other party of the agreement was released and the same became inoperative and void: Chitty on Contracts, 11 Am. ed. vol. 2, p. 1076; 1 Wharton on Contracts, 527; Campbell v. Hand, 49 Pa. 234.

This alleged covenant gave the appellees nothing more than their naked legal right to have their traffic at the same rate as other parties could obtain in the same service. It was therefore and entirely insufficient consideration for the grant of the whole future business from this valuable tract of land.

It was also in restraint of trade and was inoperative because it was neither limited in time nor partial in its operation: Harkinson's App., 78 Pa. 196; Taylor v. Saurman, 110 Pa. 6; Keeler v. Taylor, 53 Pa. 467; Beard v. Dennis, 63 Am. Dec. 380; Crawford v. Wick, 98 Amer. Dec. 103; Western Union Tel. Co. v. Am. Union Tel. Co., 38 Amer. Rep. 781; Western Union Tel. Co. v. C. & P. R. R. Co., 29 Amer. Rep. 28; 19 A. & E. Enc. of Law, 814, 816; 4 A. & E. Enc. of Law, 245,

note 6; Thomas v. West Jersey R. R. Co., 101 U. S. 71; York etc. R. R. Co. v. Winans, 17 Howard (U. S.), page 30.

The agreement violated art. XVII. of the constitution: Green's Brice's Ultra Vires, 305; Peoples v. North River Sugar Refining Co., 5 L. R. A. 386; Anderson v. Jett, 6 L. R. A. 390; Cleveland C. C. & I. R. R. v. Closser, 9 L. R. A. 754.

If this agreement was ultra vires, then although it had been partly performed on one side, it is to be treated as executory in respect to its future and further performance, and compliance with its terms cannot be compelled: Pittsburg etc. R. v. Keokuk etc. Bridge Co., 131 U. S. 371; Maryland Hospital v. Foreman, 29 Md. 532; Hood v. New York etc. R. R., 23 Conn. 609; Pennsylvania Railroad Company v. St. Louis, etc., R. R., 118 U. S. 290; St. Louis, etc., R. R. Co. v. Terre Haute, etc., R. R. Co., 145 U. S. 393; Thomas v. West Jersey R. R. Co., 101 U. S. 71; Mallory v. Hannour Oil Works, 86 Tenn. 598; Pennsylvania etc. Steam Nav. Co. v. Dandridge, 8 Gill & J. (Md.) 248.

The agreement was not a covenant running with the land: Minshall v. Oakes, 2 H. & N. 793 (9th ed. Sm. L. Cases. vol. 1, p. 187); Austerberry v. Corporation of Oldham, L. R. 29 Ch. D. 750; Keppell v. Bailey, 2 Myln. & K. 517; Cole v. Hughes, 54 N. Y. 444; Norcross v. James, 140 Mass. 188; Lyon v. Parker, 45 Me. 474.

OPINION BY Mr. JUSTICE DEAN, October 7, 1895:

On the 22d of March, 1887, the Valentine Ore Land Association (unincorporated), and William Stewart and Evan M. Blanchard, trustees of the Valentine Iron Company, had the legal title to and possession of a large body of iron ore lands, mining rights and other property in Centre county, on which was a large iron smelting furnace, partly built; the Valentine Iron Company proposed to lease this furnace and manufacture pig iron; then, in conjunction with the Nittany Valley Railroad Company, the latter, as yet only projected, to construct, equip and operate a railroad on the lands from the ore mines to the furnace, and also from the furnace to a connection with the Lemont Railroad, near the furnace. For the purpose of raising money, the Valentine Iron Company and the Valentine Land Association had executed a mortgage, dated August 2, 1886,

upon all the lands, to the Fidelity Insurance, Trust and Safe Deposit Company of Philadelphia, as trustee, to secure the payment of $600,000 of first mortgage bonds; the bonds to be sold, and the proceeds used to promote the project. The Lemont Railroad Company, in aid of the enterprise, agreed to purchase at par $75,000 of the bonds; in consideration of this aid, the Land Association, the Iron Company and the Nittany Valley Railroad Company, agreed to give to the Lemont Railroad Company and the Bald Eagle Valley Railroad Company, connecting short lines of the Pennsylvania Railroad Company, and to the last named company, the traffic to and from the ore lands, furnace and railroad. The covenant in this particular was that the covenantors " Agree, for themselves, their successors, lessees and assigns, in the nature of a covenant to run with the title of the lands held by them, that they will give all the traffic coming to or going from the property, mines and furnaces owned and controlled and to be built and operated . . . . by them," to the three railroad companies, so far as these lines were available for the covenantors' traffic, and so long as the railroad companies observed the agreement on their part. The Land, Iron and Railroad Company further covenanted that in making any grants of lands they would provide in the grants that the grantees should take subject to the covenants, and that they would not aid or encourage, in any manner, in the construction of competitive lines of railroad in the territory.

The three railroad companies covenanted they would transport the traffic thus received at fair and reasonable rates, as compared with charges on like traffic under like circumstances on other parts of their lines. It was further provided that if any dispute arose under the agreement, it should be referred to two disinterested persons as arbitrators, one to be chosen by each party to the agreement, and these thus chosen to select an umpire, if they could not agree.

The $75,000 was paid over for the bonds agreed to be taken by the Lemont Company; other of the bonds, sufficient to put the furnace and ore mines in operation, were disposed of, and all parties in observance of the agreement conducted their business until October, 1890, when, default having been made on the interest on the bonds, the mortgage was foreclosed by the trustee, and on January 29, 1891, the sheriff sold the property

to the trustee, which purchased on behalf of the bondholders, for $195,000, accepting the trustee's receipt as a lien creditor for the purchase money. Deed was accordingly acknowledged to the trustee. On February 26, 1891, by consent of the bondholders interested, the trustee, by deed, conveyed the property to the Valentine Iron Company, a corporation organized February 6, 1891; instead of the bonds, the former holders of them accepted proportionate amounts of $634,350 in stock of the new company, issued in shares of the par value of $50.00. By this change the railroad companies, plaintiffs, became stockholders in the amount proportionate to their $75,000 purchase of bonds. The new company continued the same relations with the railroad companies from the date of its organization down to the winter of 1892–1893.

On the 11th of May, 1889, the " Central Pennsylvania Railroad Company " was incorporated, to construct a railroad from Mill Hall in Clinton county to Unionville in Centre county, a distance of about twenty-five miles, located with a view to form a connection with the Nittany Valley Railroad near Bellefonte, and the Beech Creek Railroad near Mill Hall. The last named railroad is, in its terminals and connections, a competitor of the plaintiff railroad companies. The plaintiff averred that the Valentine Iron Company, since the beginning of the year 1893, had encouraged the construction of the Central Pennsylvania Railroad financially and otherwise; J. W. Gephart, the president of the iron company, being also the president of the railroad company, is also acting as superintendent of the work of construction of the competing road, and is the chief representative of the undertaking; that the Nittany Valley Railroad was leased in 1891 to the Valentine Iron Company, and is operated by the iron company. That the Valentine Iron Company threatens to give the traffic coming from and going to the mines and furnace for transportation over the Central Pennsylvania, and thence, by its connections, over the lines of competing roads.

The plaintiffs aver that the acts of defendants are in violation of their covenants in the agreement of March 22, 1887, and pray that they be restrained by injunction.

The defendants demurred to the bill:

1. Because by the sale on the mortgage they took the property free and discharged from all the covenants of the agree-

ment, the agreement having been executed subsequent to the mortgage.

2. The purchaser at the mortgage sale took the land discharged of the covenants, therefore every other party to the agreement was released.

3. That the agreement was without consideration, and is therefore void.

4. The agreement was against public policy.

5. It was in violation of article XVII. of the constitution, and is not enforceable in law or equity.

6. That the Nittany Valley Railroad did not covenant nor aid in the construction of competitive lines of railroad.

7. That the restraint of the construction of competitive lines, whether by moral support or otherwise, is illegal.

8. That to enjoin defendants from giving traffic to a common carrier, under the laws of the commonwealth, is in restraint of trade.

9. There is an adequate remedy at law.

The court below after argument sustained the 1st, 2d, 4th, 5th and 8th grounds of demurrer, and entered a decree dismissing the bill, and from that decree plaintiff appeals, assigning sixteen errors to the decree and opinion of the court.

The bill sets out the facts in substance as we have stated them, and it follows from the demurrer that defendants admit them as averred.

The opinion of the learned judge of the court below is in good part devoted to demonstrating that the covenant to transport the traffic to and from the orelands and furnace over plaintiffs' lines, and not to aid and encourage the construction of other or rival roads to the source of the traffic, is not a covenant real which runs with the land, binding upon the heir, successor or assignee, but is a mere personal covenant binding only upon the parties to it.   Spencer's Case, the leading case, 1 Smith's Leading Cases, 9th Am. ed. p. 174, with many of the cases cited in the notes to the leading case, and others which do not there appear, are relied on as authority for this holding. Spencer's Case is taken from 5 Coke, 16, as reported by Coke, who says that among other questions it was decided, " Where the assignee shall be bound without naming him, and where not; and where he shall not be bound, although he be expressly

named, and where not." It then appears from the case that the second of the seven resolutions adopted by the court is: "If the lessee had covenanted for him and his assigns that they would make a new wall upon some part of the thing demised, that forasmuch as it is to be done upon the land demised that it should bind the assignee ; for, although the covenant doth extend to a thing to be newly made, yet it is to be made upon the thing demised, and the assignee is to take the benefit of it, and therefore shall bind the assignee by express words . . . . But, although the covenant be for him and his assigns, yet if the thing to be done be merely collateral to the land, and doth not touch or concern the thing demised in any sort, there the assignee shall not be charged."

This case, decided three hundred years ago, as with many of the cases of that time, bases its conclusions in the main on the results arrived at by the ratiocination of the judges. They assumed certain premises, and if from these a certain conclusion was reached, then the judgment was for plaintiff or defendant; as for instance in the first resolution, " When the covenant extends to a thing in esse, parcel of the demise, the thing to be done by force of the covenant is quodammodo annexed and appurtenant to the thing demised, shall go with the land, and bind the assignee, although he is not bound by express words." Here the assignee is bound although the covenantor hath not so said; then the same resolution goes on: " But when the covenant extends to a thing not in being at the time of the demise made, it cannot be appurtenant or annexed to the thing which hath no being." Here the covenant does not bind the assignee, although the covenantor hath so said. Resort was had to the instrument to ascertain the subject of the contract, and when that was settled on a contract was made by the judges for the parties, without much regard to what the parties said ; they looked not for the expressed intention, with a view to giving it effect in the judgment, but adopted a conclusion, based often on an artificial or arbitrary rule of construction, and this conclusion molded the judgment; the intention was subordinated to the rule. As shown by the large number of cases, both in England and this country, cited by the able editors of the notes to Spencer's case, there has been more or less of a struggle by the courts in the three centuries which have elapsed

since that decision was announced to escape from its application; and very often if the rule defeated the manifest intent of the parties, some distinction was found or assumed which warranted a disregard of it; and in some cases where the rule, if invoked, would plainly shut the door against equity, the door was closed against the rule. Like the arbitrary ancient rules in Shelley's case, in Twyne's case, and others, it has been given such flexibility by so many later decisions that, without overruling well decided cases, it is impossible to rigidly apply it at this day, even in common law actions. Whether under our system of administering equity, if this were an action at law, Spencer's case would rule it on the facts, it is not important to decide. This is not an action at law, but a bill in equity, and the controlling element is the intention of the parties to the covenant; and so it is laid down by many of both the English and American decisions, some of them cited in the notes to Spencer's case. In the note on page 198, English notes, it is said: "In Tulk v. Moxhay, 2 Phil. 774, it was laid down by Lord COTTENHAM that a covenant made by the purchaser of land, that he and his assignee would use or abstain from using the land in a particular way, may be enforced in equity against all purchasers, without reference to the question whether the covenant ran with the land." And it is remarked by the editor, that Keppell v. Bailey, 2 Mylne & Keene, 517, in the court of chancery, a case cited and relied on by the court below and appellees in this case, is overruled by Tulk v. Moxhay, and the latter case has been since followed and extended.

Take the facts as they are averred in the bill in equity, and as they are here admitted by the demurrer: 1. The complainants contributed $75,000 for the development of the ore land, and the construction of a furnace and railroad. 2. The furnace and railroad were constructed; were put in operation, and ore mines from which was obtained ore to run the furnace opened. 3. The property was sold on a mortgage antedating the agreement and $75,000 contribution, about seven months. 4. Those who had the legal title and equity of redemption made the contract, by which they secured plaintiffs' money, and in consideration therefor covenanted for themselves, successors and assigns, in the nature of a covenant to run with the lands, to give all traffic coming to or going from the ore lands

and furnace to plaintiffs' lines.  5. The Valentine Iron Company, the present assignee of the property from the sheriff's vendee, from January, 1891, for nearly two years, accepted all the benefits derivable from this contract, as shippers, and affirmed it.  6. Defendants refuse absolutely to perform the covenants entered into by their predecessors in title, although the very existence of the property occupied and enjoyed by them was created in part by the large contribution of defendants.  7. There is no adequate remedy at law for a persistent violation of such a covenant.

Should the facts as they thus appear move the conscience of a chancellor to afford relief to the injured party?  We do not consider it important that, by the judicial sale and reorganization of those interested under a new charter, the nominal identity of the actual parties to the covenant and those now in possession has been changed.  The averment of affirmance of the contract by the present defendants is admitted by the pleadings.  That the affirmance of a traffic contract touching land rests in parol will not prevent the interposition of equitable principles, even where the contract postdated a lien through which the defendant claimed title.

In Campbell v. Hand, 49 Pa. 234, adjoining owners of land on opposite banks of a stream agreed to build and keep in repair a dam for the use of both; on a judgment against one of them, antedating the agreement, his interest was sold at sheriff's sale; the sheriff's vendee used the dam, as did the debtor in the judgment; the court below held the sheriff's vendee bound to contribute to the repairs, because he had, by the use of the dam, affirmed the agreement; this court, THOMPSON, J., says: " I will not undertake to say the contract created covenants running with the land, because the covenants could not undertake to impose a covenant or duty that might not be divested by a sale of the premises so encumbered by a prior judgment, a sale on which would carry back the title to a period coeval with the date of the lien. . . . Now, why should not the assent of the sheriff's vendee, and that of the remaining cotenant, be sufficient to continue the original covenants in their original efficiency?  I do not think it is a sufficient negative of the inquiry to say the remedy on the covenants is not pursued."

What would have been the effect of a denial of any affirmance of this contract by the sheriff's vendee, or these defendants, we are not called upon to say; we decide the point on their admission of the affirmance of it.

Nor is the contract as contended by appellees, and as held by the court below, without consideration; the preliminary statements to the stipulations show the value of the consideration. The Land Association and Iron Company, with the Nittany Valley Railroad Company, are about to construct the railroad from the furnace to the mines on the land, and from the furnace to a connection with plaintiffs' lines; they are about to complete a furnace or furnaces partly built; for the purpose of securing funds they have placed a mortgage to secure $600,000; they cannot carry out this project with a paper mortgage; they want the money which it is to secure; plaintiffs give them $75,000 and agree to carry their products at reasonable rates; if any dispute arises about what is reasonable, they agree to the establishment of a tribunal to determine the dispute without resort to the courts. In consideration of this aid in the development of their property, defendants agree to give them their traffic. Without such development, the railroad to carry the ore from the mines to the furnace head, and from the casting-house to market, their property for present enjoyment is useless; by the stipulated aid it is valuable. This is an ample consideration.

It is held by the court below, the contract is in violation of sections 1, 3 and 4 of article XVII. of the constitution. The first section provides that all railroads, as common carriers, shall carry each other's traffic without discrimination. There is nothing in the agreement which contravenes this provision; the railroad company must carry such freight as a shipper offers it; if freight by the public be routed over its road to destination by way of the Central Pennsylvania Railroad, it must so forward it; it is not averred in the bill that the contract is to the contrary.

Section 3 of the same article provides that all individuals shall have equal rights to transportation, without discrimination. The bill does not seek to deprive the iron company of the right here guaranteed. The right of every shipper is to make a contract with such common carrier as he chooses, to

carry his goods to destination ; if he make none expressly, the law implies one with the carrier who accepts his goods. But he cannot make contracts with two or more carriers to carry the same goods; if he do, as but one can carry, the others can invoke the law as a remedy for his violation of contract. If he contract with a railroad to lay its rails to his manufactory or furnace, and furnish him money to aid him in bringing the raw material to the furnace, and he, in consideration, promises to give the railroad the transportation of such manufactured product to market at reasonable rates, how is the shipper deprived of any right? He but exercises the right guaranteed by the constitution ; he contracts for the carrying of his own product for shipment to market from his own manufactory, with whom he pleases ; the constitution does not go further, and guarantee him a right to violate his contract when he pleases.

How this contract offends against section 4, which prohibits the consolidation of parallel and competing roads, we do not understand, although this is one of the reasons given for declaring the contract void. The Nittany Valley Railroad, whose traffic is sought by plaintiff, is not a parallel road, but a connecting road, prolonging the plaintiffs' reach into new territory ; the Central Pennsylvania is parallel to plaintiffs' line ; it has no contract, either for traffic or consolidation with plaintiffs. The right of one road to lease, make traffic contracts with, or consolidate with connecting roads, not parallel or competing, has not for thirty-four years been doubted, that we know of ; the act of April 23, 1861, expressly confers such right, and the constitution does not affect it, except to prohibit the consolidation and leasing of parallel and competing lines. The rights of connecting roads under that act have been recognized many times since the adoption of the constitution of 1874 ; and that contracts for through business, both freight and passenger, between connecting railroads and shipper, are not only not ultra vires, but, on the contrary, have for their basis sound business principles ; and special contracts may be made with a special class of shippers to secure business ; see Fitchburg R. R. Co. v. Gage, 12 Gray, 399 ; Hersh v. N. C. R. Co., 74 Pa. 181 ; Munhall v. Pa. R. R. Co., 92 Pa. 150 ; Hoover v. Pa. R. R. Co., 156 Pa. 220. In this last case, the contract was with a manu facturing company for a special rate on coal used for manufac-

turing purposes; the contract was made eight years before the suit, with a view to the building up and development of the plant. This court, in a most exhaustive opinion by our brother GREEN, in which nearly all the authorities on the subject are noticed, held that special contracts for a special rate with a manufactory for the transportation of fuel was not undue discrimination; that blast furnaces, iron mills and rail factories are encouraged and built up in sparsely settled regions by the aid of such contracts. While the question of discrimination does not arise in this case, the same principle is involved. Is a contract by a railroad company with an iron company, in which the former contributes a large sum of money to the latter for development, and gives to it facilities for transportation, in consideration of which the iron company contracts to give it all its traffic, ultra vires? It is not in restraint of trade, for its express purpose and necessary effect are to increase both trade and population; not a single traveler or shipper outside the contracting party is affected in his selection of a route; the contract binds none of them.

It is not seldom those who have reaped benefits from a contract such as this seek to escape its obligation by taking refuge in that assumed turpitude which, on grounds of public policy, avoids the contract; but here, and it is a gratification to us to say it, the parties to this contract violated no law, restrained not others from engaging in business, did nothing of evil example or detrimental to public morals; therefore, there is no public policy which, in the absence of express legislative enactment, makes void this contract; as there clearly is no adequate remedy at law for repeated or continued violations of the defendant's covenants, they ought to be enforced in equity to the extent equity will take cognizance of their violation.

While the covenant to ship over plaintiffs' lines, on the faith of which plaintiffs enlarged their facilities for shipment and paid their money, will be enforced, our decree will go no further. The Central Pennsylvania Railroad is a corporation under the laws of the commonwealth, authorized to construct a line of railroad between certain terminals; its manifest duty is to construct its road for the benefit of the general public; no citizen can be restrained from giving its construction moral and material aid; public policy demands that it shall fulfill the ob-

jects of its being. Admit that the officers of defendant company are giving it moral aid and encouragement because its construction will make it possible for defendants to violate their contract for shipment; this, at most, shows disregard of a moral obligation, without an infraction of the legal one, the actual shipment; the latter, equity can control, the former, it will not, both on grounds of public policy, and because its process would, to a great extent, be ineffectual. We cannot prevent men wanting to violate their contracts, while we can prevent the overt acts which constitute the breach; equity can enforce a tangible, substantial right of property under a contract, but it cannot make men good, and it is a very rare case in which it even tries to. With these defendants, however, who have pleaded, the case is different; we can restrain them from a flagrant violation of an essential covenant of their contract. The Nittany Valley Railroad Company and the Valentine Iron Company affirmed the original contract which, in fact, gave them a business existence; they are bound to give their traffic to plaintiffs; this much of the contract is within the grasp of equity. Therefore, the decree of the court below sustaining the demurrer is reversed and set aside at costs of appellees, and it is adjudged and decreed that an injunction issue directed to the Nittany Valley Railroad Company and the Valentine Iron Company, their and each of their officers, agents and employees, including the said J. W. Gephart, president of the Valentine Iron Company, restraining them from giving any traffic coming from or going to points upon the railroad of the said Nittany Valley Railroad Company, or coming to or going from the mines and furnaces of the said Valentine Iron Company, that may be owned or controlled by the said company, and originating upon said lands mentioned and described in agreement of 22d of March, 1887, to the said Central Pennsylvania Railroad Company or to any company or persons other than to the said plaintiffs. It is further ordered that the said contract be specifically performed in this respect; they, the said Nittany Valley Railroad Company and the said Valentine Iron Company are hereby ordered and directed to give all traffic coming from or going to points upon said railroad, or coming to or going from the property, mines and furnaces of the said iron company, in so far as said traffic originates with

or is controlled by them, the said companies, to them, the said plaintiffs, their successors or assigns. It is further ordered, this record and decree be remitted to the court below, that our order and decree may be carried into effect.

Defendants petitioned for modification of decree.

PER CURIAM, Oct. 24, 1895:

And now October 24, 1895, petition for modification of the decree heretofore entered, is dismissed.