## No. 10,504.

### HEIRS OF P. ROBIN DELOGNY VS. W. N. MERCER ET ALS.

A vendor is bound to express himself clearly as to the extent of his *obligations*, and an obscure or ambiguous clause must be interpreted against him.

Expressions employed in a *prospectus*, setting forth the terms of credit and the conditions of a sale of real estate, which forms part, by formal reference, of the act of conveyance, are to be read as incorporated into the contract.

Language thus used, showing that the intention of the vendor is to sell specific riparian estate, and in consideration of the sale to *obligate* himself to leave free, for the common use of the purchasers, a certain *space* in front thereof, between designated limits, without any qualification as to the duration of such obligation, when this should have been done, if designed, must be interpreted as meaning an abdication, or abandonment, or divestiture in perpetuity, of al previous title of the settler to the *space*.

| 43 | 205 |
| 48 | 192 |
| 49 | 764 |
| 43 | 205 |
| 52 | 972 |
| 43 | 205 |
| 107 | 349 |
| 43 | 205 |
| 111 | 273 |

This is so, even though the vendees are expressly denied the right of disposing of the space for any one's benefit, particularly when the privilege or grant is bur dened with the obligation, on the part of the beneficiaries or grantees, of repairing roads and levees and draining the spot subjected to the use.

The allowance, privilege or grant is a covenant which runs with the lands, absolutely conveyed, and in favor of the lots sold, whoever the owners be, to no end of time.

A PPEAL from the Civil District Court for the Parish of Orleans.
Rightor, J.

---

*Edgar H. Farrar* for Plaintiffs and Appellees:

1. Fee simple title being shown to exist in plaintiffs' ancestor, it continues in them unless divested, and the divestiture must be shown.

2. Right to batture is a right inherent in riparian property. It results from natural law, in consequence of the local situation of the land to which it attaches. Mun. No. 2 vs. Orleans Cotton Press, 18 L. 122.

3. Neither the plan nor the prospectus of the Faubourg Lacourse show any intention of dedicating to public use the levee and the batture between the levee and the river.

The city admits that there was no such dedication to public use, but contends that if it is in error in this admission, and the court thinks otherwise, the court can hold that there has been such a dedication. She wants two strings to her legal bow: one furnished by her counsel, and if that snaps, the other by the court.

5. The claim that the tenth section of the Delogny prospectus transfers the riparian property to the lot purchasers, and divests the title of the Delognys, is not maintained by the terms of the alleged grant, which purports only to bind the vendor to leave the space in question " free to the common use " of the lot purchasers, prohibiting to them both the *jus fruendi* and the *jus disponendi*, containing no words of alienation or of perpetuity, and imposing on them as a charge certain obligations which the law of itself imposed on them.

6. Such a provision in the prospectus of a riparian faubourg is nothing more than the expression, in favor of the lot owners, of the general servitude which the law imposes in favor of the public on the batture.

7. The original batture having increased so as to leave large portions unnecessary to the public use, the public servitude is terminable by the act of the muncipal authorities, and a sale of a portion of such batture by such authority terminates such servitude, changes the destination of the property, and enables the riparian owner to recover the property in the hands of a private purchaser.

8. If an obligation to leave riparian property free to the common use of lot purchasers in a faubourg, is the grant of a particular servitude on the batture in favor of the lots they buy, and such servitude is not drowned in the greater one to the whole public, and does not disappear when the greater one disappears, then the existence of such a servitude is no bar to the eviction of one without title, or who holds and enjoys the property as a private owner, by the riparian proprietor. The trespasser, or person without title, can not set up the servitude to defeat the owner under whom the owners of the servitude hold. The owners of the servitude can enforce their rights, or not, as they please.

*Merrick & Merrick* for St. Anna's Asylum, Defendant and Appellee:

1. The brief is taken up for the most part by the statement of the facts of the case. The city, our warrantor, has, as it was bound, assumed the defence of the case. On the question of title we will not offer arguments which can in any way mar the unity or effect of the argument of the able city attorney. See Mathes vs. Meyers, decided April 7, 1890.

2. The force and effect of the act of sale of the city to Dr. Mercer, in 1854, is controlled by the Code of 1825, and the city of New Orleans is thereby bound (1) under Article 2485 for $10,900, value of useful improvements; (2) for the sum of $10,843.66 for the rents and revenues which the plaintiffs' subrogee has recovered against this defendant, and (3) for $4150, the original price paid the city, and interest on all these sums. C. C. 1825, Art. 2482; R. C. C. 2506; Delord vs. New Orleans, 11 An. 701; Dyson vs. Phelps, 14 An. 623.

*Saml. L. Gilmore*, Assistant City Attorney, for City of New Orleans, Warrantor and Appellant:

1. When a clause is susceptible of two interpretations, it must be understood in that in which it may have some effect rather than in a sense which would render it nugatory. Art. 1951, C. C.

2. The reduction to private ownership of batture withheld by the city or its transferees, can only be recovered by the riparian proprietor upon allegation and proof that it is not necessary to public use. Act No. 333 of 1853; Cire vs. Rightor, 11 L. 142.

3. The city does not represent its citizens in cases where their private rights of property and servitude are involved, and controversies regarding such rights must be held contradictorily with the citizens themselves.

4. A real servitude is not established unless the deed said to create it describes with certainty the property which owes it, the property to which it is due, and the nature of the servitude itself. Parish vs. Municipality, 8 An. 152.

5. A right of use or usufruct being a personal right can not be created unless it be made to a person named, on account of that person alone, and independently of his being in possession of a particular estate. See authorities cited in argument of Mr. Le Gardeur in Arnould vs. Delachaise, 4 An. 116.

6. A right of use or usufruct expires by the death of the grantee, and where it is evident that the grant is one in perpetuity, it can not be merely one of use or usufruct. To give the perpetual use or usufruct of a thing is to give the ownership of the thing. Art. 606, C. C.; Arnould vs. Delachaise, 4 An. 111.

7. The seller is bound to explain himself clearly respecting the extent of his obligations, and any obscure or ambiguous clause must be construed against him Art. 2474, C. C.

The opinion of the court was delivered by

BERMUDEZ, C. J. This is technically a petitory action, instituted in 1860. It was determined in the first instance only in 1889, nearly thirty years later, having remained dormant in the meantime.

The original plaintiffs have transferred their interest in it to an assignee, who continues it in his own behalf.

The sum total of the prolific and argumentative petition is to the effect:

That the author of the plaintiffs, P. R. Delogny, from the date of his purchase of certain lands fronting the Mississippi down to the present day, has never parted with his title to that portion of it which lies between the front line of the front lots (sold by him in 1807) and the river.

That the sale then made on certain terms, contained in a *prospectus* published at the time, provided for no divestiture of the ownership of said portion, either by dedication to the public use or otherwise, and secured nothing beyond an *easement* thereon in favor of the purchasers, who subsequently lost their right thereto by non-user or change of destination, by legislative and municipal interference. and action.

That after the levee on said portion had been removed forward the portion or space was not necessary for public use, and the plaintiffs had a right to take possession of and enjoy the same absolutely.

That the city of New Orleans, claiming to own a triangular fraction of said space, undertook, without warrant, in 1854 to sell it to the defendant, who took and is in possession of it; but that the city conferred and the purchaser acquired no title whatever thereto.

The prayer is that the triangle be declared to be the property of the plaintiffs; that the sheriff put them in possession, and abate and remove the constructions thereon should the defendant fail to do so; that the plaintiffs recover fruits and revenues until the surrender of the property.

The answer is a general denial, accompanied with an averment of the purchase in 1854 from the city of New Orleans, which is called in warranty, and which urged various defences, leveled against the pretensions set up by the plaintiffs, and justifying its doings.

The main defendant having died, the special legatee of the property, the St. Anna's Asylum and the universal heir, Butler, became parties in his stead, standing on the call in warranty.

It would serve no useful purpose to allude to other proceedings.

The District Judge, for "reasons orally assigned," rendered judgment for the plaintiffs, with a right to fruits and revenues, subject to indemnity for improvements in favor of the defendant, and against the city for the price of the property and the revenues, to which the defendant had been condemned.

By the silent acquiescence of the litigants, who do not assail the pecuniary adjustments, the issue to be determined, on the appeal, relates to the title *vel non* of the plaintiffs to the triangular piece of land, which forms part of the original space, mentioned in the *prospectus* as lying between the front line of the lots and the river.

The established facts are the following:

In 1807 P. R. Delogny, who had previously acquired from J. F. E. Livaudais, for $70,000, a certain tract of land having riparian privileges, about half a league above the city of New Orleans, fronting on the Mississippi river, being part of an estate then known as the *Marigny Plantation*, shortly after, in the same year, divided it into squares and lots, which he advertised for sale according to a map by Lafon, surveyor of the territory, and to terms and conditions set forth in a *prospectus* also made public; the locality in which the land was situated being known as "Faubourg Lacourse."

In the front of the front squares and lots a broad street named *New Levee* was left open, beyond which there was an embankment and also a batture, touching which no mark is found on the plan.

The squares and lots were all sold on certain terms of credit and conditions, specified in the *prospectus*, which formed part of the act of sale in each case, by formal reference.

The tenth section of the *prospectus* reads as follows:

"*En considération de la dite vente, le vendeur s'oblige de laisser libre, pour l'usage commun des acquéreurs, l'espace qui se trouve entre le fleuve et le première ligne de terrains de la devanture, marqué, sur le dit plan, sans pourvoir jouir, ou disposer, soit à leur profit, soit à celui d'autrui, à la charge par les dits acquéreurs, chacun en droit soi, de rester obligé de l'entretien des chemins, des levées, et de fairs tous les canaux d'écoulement, ou d'égout qui pourraient leur être nécessaires. respectivement. A cet égard, le vendeur, d'accord avec M. Livaudais, a fait marquer sur le plan, l'emplacement d'un canal pour servir d'é-gout commun.*"

*Labentibus annis*, a considerable batture was formed between the line in front of the front squares and lots sold and the river. So much so that a plan in evidence shows that in 1834 a street named *Front* was laid in front of *New Levee* street and a square, which includes the *triangle* involved, was laid, bounded by those two streets and other streets, with a batture between the new street and the river.

Another plan shows that in 1837 this triangle was thereon designated by Bringier, surveyor general, who made it, as "*Property ceded by the original proprietor to the public.*"

In 1854 the city of New Orleans undertook to sell to W. N. Mercer this triangle for some $4000, who went into possession of and improved it.

In 1860 the heirs of P. R. Delogny brought the present action to recover the triangle. What followed has already been stated.

Under that state of things the question arising for solution is simply:

Did or not the sale made by Delogny in 1807 of the squares and lots, under the terms and conditions and stipulations set forth in the *prospectus*, divest him absolutely and irrevocably of all title to the triangle in dispute?

The contention of the plaintiffs is that it did *not*; and that, if it did, it was conditionally, and that by non-user or change of destination the dominion returned to them.

Being strictly petitory in character, the action must be governed by the rules applicable to such cases, the main of which is that the plaintiffs must recover on the strengh of their own title, and not on the weakness of their adversary's.

The absolute or conditional title which the plaintiffs claim not being apparent on the face of the act of sale and *prospectus*, the attempt is made to establish it by deductions.

The plaintiffs charge that, as the title to the triangle, which assuredly dwelt in their author Delogny after his purchase, was not divested by the sale, either by a dedication to public use or a transfer to the purchasers; and as the only benefit conferred as to it on the purchasers was to secure to them the quiet enjoyment of servitudes established by law and previously existing in favor of the public, the title continued to reside in him subject to a mere servitude of common use.

It is further, however, pressed by them that were it true that the title passed from him either to the public or to the vendees, it reverted to them, continuing from them in their assignee because of *non-user* or change of destination.

On the other hand, it is contended that when Delogny sold *all* the squares and lots he irrevocably parted with the ownership of the space between the front line in front of them and the river, as he

obliged himself to leave it free, and so abandoned it in perpetuity for the common use of the purchasers in consideration of the sale, and that whether its destination was or not changed after the divestiture is no concern of his representatives, as the concession was absolute; and that if the change took place, the purchasers are the only ones to complain, and they have not done so; that it is irrelevant and immaterial to the issue presented by the plaintiffs whether the sale by the city to Mercer did or not confer ownership and full dominion to the latter.

As it is apparent that Delogny never made a dedication of that space to the public, the issue is practically narrowed down to the inquiry, whether or not an abdication and transfer of the title took place in favor of the purchasers by the use of the words contained in the prospectus, viz: " *In consideration of said sale* the seller *obligates* himself to leave free for the common use of the purchasers the space, * * * the purchasers to remain bound to repair," etc.

At first sight it is evident that the language used does not so clearly express the intention of the seller as to preclude or dispel any doubt as to what it unquestionably was, for it is manifest that, had not the terms used been deemed susceptible of a double signification, this controversy would not have arisen. It would not have lingered as long, and learned counsel would not have had to appeal to the Roman and to the French law and to our own to establish its meaning.

It is patent that the intention of Delogny was to sell the land which he had acquired from Livaudais. To accomplish that object as advantageously as practicable, he divided it into squares, separated by intersecting streets—those perpendicular to or in the direction of the river leading to a main front street; gave terms of credit, and, with a view to enhance their value, offered to the purchasers *in consideration of the sale*, and besides the absolute, full and complete title to the specific land conveyed and sold, an inducement of value which formed part of the thing or object of the contract between them.

That inducement was that he obliged himself to leave free for the common use of the purchasers a certain designated space, without the right of disposal by them, but with stated obligations relative to the road, levee and necessary drainage canals.

He therefore proposed selling and sold the specific lot, together· with the right of use of the space, complied with those restrictions, and the purchasers, when they agreed to buy and bought, expected to acquire and acquired a title, *absolute* as to the squares and lots purchased and *qualified* as to the use of the space, but not so, however, as to leave *any* title whatever in the vendor.

It at once strikes the synthetic mind that there is not a word or the least intimation in the terms used to indicate that the privilege or advantage conceded by the *prospectus* touching the use of the *space*, was not to be indefinite or perpetual, but was to be temporary only.

Had it entered the mind of Delogny not to bind himself to leave that space free *for ever*, but only for a limited period, it would have been to his interest, and surely his duty, fairly to have so clearly stated, and he has not done· so.

It is very evident that his object was to connect irrevocably, with the right of absolute dominion over the specific property conveyed, the benefit of the use of the space for no determined time.

Clearly he " obligated himself to leave free, for the common use of the purchasers, the space."

If the obligation which he thus voluntarily, in advance and subsequently by contract, imposed upon himself, was not one which he was *for ever* to respect, and one which he could have been forced to observe had he attempted to obstruct the use, what was the time to be during which it was to last ? There would be as much justification to answer a century as an hour.

The section in the *prospectus* unquestionably means that Delogny obligated himself to leave free the space in question, by abandoning *for ever* all right of obstruction to the use conceded in favor of· the purchasers.

It will not do to say that, from the exclusion of the right of enjoyment and of disposal, it is legally inferrible that the fee or naked ownership continued in the seller; for, in cases of dedication for public use, for instance, the denial of the right of alienation not only is often formally expressed, but is always implied, in the absence of clear stipulation to the reverse. In such cases the fee or title is completely and absolutely divested, passing at once from the grantor to the grantee, *sub modo*.

Neither does it avail to say that the words used do not purport to· *allow* anything, but the common use to the purchasers.

Heirs of Delogny vs. Mercer et als.

If the *allowance* be to a perpetual common use, the conferring of the unrestricted benefit carries with it the title to the ownership of the thing to be thus used. It is a "covenant which runs with the land;" in other words, a species of servitude resting on the space, in favor of the lots, whoever the owners be, to no end of time.

It is further insisted that this servitude was no broader than, and was nothing additional to, the general servitude imposed by law in favor of the whole public, of which the purchasers formed part, which was determined by the change of destination of the use of the thing, namely, the space.

If such were the case, it was useless to insert the allowance or privilege as an inducement, and the incorporation of it in the *pros-pectus* was a fraud, the giving of the shadow for the substance, a deception, of which the seller should not be permitted to take any advantage. *Væ mihi quia tacui!*

"If there were any doubt concerning the extent and meaning of the terms made use of in this contract, the law would oblige us to construe them against the seller.

"The vendor is bound to explain himself clearly as to the extent of his obligations, and an obscure or ambiguous clause must be interpreted against him." Arnauld vs. Delachaise, 4 An. 120; C. C. 2449; R. C. C. 2474; L. 39, *De pactis*.

In the first cited case a germane question arose, which was most thoroughly discussed, as appears from the reported learned briefs of the erudite and distinguished counsel engaged, and by the lucid and conclusive opinion delivered, which determined it adversely to the the pretensions of the vendor.

It is true that the words used in the *prospectus* there were "*abandoned in perpetuity*, while they are not the same in the instant controversy; but we have seen that the words "*obligates himself to leave open*" are of equivalent import, and this makes the rulings in both cases concordant on principle, and therefore consonant with law, justice and equity.

Having reached the conclusion that Delogny at the time divested himself absolutely and irrevocably of all title to the space of which the triangle in controversy formed part, it becomes unnecessary to pass upon the question whether by the non-user or change of destination this title has reverted to and dwelt in his heirs, and now resides in their assignee.

The purchasers are not heard to complain. Had they done so, their chances of recovery would surely have been more than doubtful. The third and more of a century effectually closes many mouths.

It is therefore ordered and adjudged that the judgment appealed from be reversed; and it is now decreed that there be judgment, rejecting plaintiffs' demand, and that of the defendant, calling the city of New Orleans in warranty, and that the costs in both courts be paid by the plaintiffs or their assignee and present representative.

Rehearing refused.