Statement of the Case.
MONROE, J.
Plaintiff brings this suit to recover damages for the failure of defendant to comply with an alleged obligation of a certain contract, to have it decreed that said obligation is a covenant running with the land to which the contract relates, and to enjoin defendant from further violating the same; the facts underlying the suit being, substantially, as follows:
On June 27, 1902, George W. Pack Land & Lumber Company entered into a contract with two individuals, Kelley-and Daugherty, whereby it obligated itself to sell them a large body of timbered land, situated in Winn parish, for $554,842.80, payable at different times from the date of the contract to June 27, 1906, when the last installment, represented by a note for $100, fell due, and for the further consideration, which is thus expressed, to wit:
“Fifth. It is further mutually agreed between- the párties that, whereas George W. Pack is largely interested as a stockholder in the said George W. Pack Land & Lumber Company, and is also interested, as a stockholder, in the Louisiana & Arkansas Railroad, soon to be succeeded by the Louisiana & Arkansas Railway Company; and whereas, it is largely to the interest of the said George W. Pack Land & Lumber Company that the lumber and other material that may hereafter be cut or taken from the timber or logs from the lands described in this contract shall be carried over the Louisiana & Arkansas Railroad and its connections, and it is the mutual wish of the parties hereto so to provide: Therefore, as a part of the consideration of this contract, the said parties of the second part further agree that they will hereafter, and before there shall be cut from the lands described in this contract any logs or timber or other material, enter into a contract with the Louisiana & Arkansas Railroad, or its successors, by the terms of which the said parties of the second part shall agree that all tonnage arising from the manufacture of the timber or logs cut from said lands shall be transported over the railroad of the said Louisiana & Arkansas Rail *291 road or its successors, the said Louisiana & Arkansas Railroad, upon its part, or its successors in said contract, agreeing _ that said railroad, or its successors, will give to the said parties of the second part reasonable service and rates and equal to the service and rates obtainable from other roads. And the said party of the first part, upon its part, agrees that it will procure from said Louisiana & Arkansas Railroad or its successor, the Louisiana & Arkansas Railway Company, for the parties of the second part, a contract of the character above described.
“Sixth. It is further mutually understood, covenanted, and agreed that all the conditions heretofore set forth in this agreement to sell, and imposed on the parties of the second part, are suspensive conditions, whether .as to payment of price, payment of taxes, cutting and removal of timber, tonnage and transportation over said railroad or railroads, or any other matter hereinbefore recited, and that no title of said lands, or any of them, shall vest in the parties of the second part hereto until each and all of said conditions shall have been fully complied with, and any failure on the part of the parties of the second part or its (their) assigns to promptly make any of the payments, principal or interest, herein provided to be made, at their due dates, or any failure to fulfill any of the conditions of the said agreement, or any violation of the terms of the same by the said parties of the second part or its (their) assigns, shall, at the option of the party of the first part, annul the said agreement, without any further notice, and without putting in any default, and without the necessity of resorting to any court of justice; and the parties of the second part shall be considered a trespasser [sic] and liable to be proceeded against in the same manner and to the same extent as provided by law in cases of trespassers upon pine or other land. All the obligations and conditions herein contained are hereby declared to extend to and be binding upon the legal representatives and assigns of the parties hereto.”
The defendant herein, by mesne conveyances, acquired the rights and assumed the obligations of Kelley and Daugherty in the contract thus described, and, in 1907, filed a bill in equity in the United States Circuit Court for the Western District of Louisiana, accompanied by a tender and deposit of $101,-765 as the balance, with interest, of the money due under the contract, announced its readiness to comply with said contract in other respects, and prayed for a decree, ordering the Pack Company (as we shall call it) to comply. The Pack Company and the Louisiana & Arkansas Railway Company answered, and afterwards filed a cross-bill, in which they alleged that the complainant had violated the contract sued on by refusing to enter into a tonnage contract, and by cutting and removing timber from the lands in question, and, whereby they offered to return what had been paid by complainant, and prayed that the contract be annulled, or, in the alternative, that complainant be ordered to comply with it, and that it be decreed that the lumber and other material, hereafter to be cut or taken from the timber or logs, from the lands described in the contract, be transported over the road of the Louisiana & Arkansas Railway Company, and complainant required to enter into a contract to that effect, and that there be judgment against said complainant on the cross-bill for $750, as damages resulting from its failure to deliver for transportation the lumber and other material made from the logs and timber already cut and removed. The court held that the complainant was entitled to specific performance, and handed down a decree in which was incorporated a form of sale of the land, and a form of tonnage contract, which the parlies were ordered to sign.
The cross-bill was dismissed “for want of equity,” with—
“reservation to the Louisiana & Arkansas Railway Company of any and all claims it may have for damages alleged for any alleged actions of the Winn Parish Lumber Company in respect to the sale of the timber and logs from the lands aforesaid, or for the nondelivery of any tonnage arising from the lumber and logs cut from said lands.”
And the decree proceeds as follows:
“It is further ordered, adjudged, and decreed that nothing in this decree shall be construed as deciding that the tonnage contract aforesaid is a covenant which runs with the title of said lands conveyed by the G. W. Pack Land & Lumber Company, or that it is not a covenant running with the title of said lands; the court c'onsidering_ that it is not necessary to decide that question at this time.”
*293 The judgment so rendered was acquiesced in, and the parties signed the contracts, as prescribed; the tonnage contract containing the recital that it was entered into in accordance with the terms of the contract between the Pack Company and Kelley and Daugherty, in which the Winn Parish Lumber Company had succeeded to the rights and obligations of said Kelley and Daugherty, and, further reading as follows, to wit:
“Now, therefore, pursuant to the foregoing agreements and provisions of the Pack-Kelley contract, and in performance thereof, said party of the first part hereto has agreed and does hereby agree with said second party hereto that all tonnage arising from the manufacture of the timber or logs cut from the lands described in said Pack-Kelley contract shall be transported over the railroad of said second party,, or its successors. And, pursuant to the foregoing agreements and provisions in said Pack-Kelley contract and in the performance thereof, said second party hereto and its successors will give to said first party hereto reasonable service and rates and equal to the service and rates obtainable from other roads.”
In the present suit the Louisiana & Arkansas Railway Company, plaintiff, complains that the Winn Parish Company, defendant, has, since the signing of the contract, above recited, cut from the lands in question 6,500,000 feet of timber, and, in violation of the tonnage contract, caused the same to be hauled by other roads than that belonging to it, and that, as the initial carrier, it would have made a profit of $15,000 thereon, for which it prays judgment; and it further prays that the tonnage contract be decreed to import an obligation—
“running with the land, and operating as a lien and burden thereon, until all the tonnage arising from timber thereon shall have been removed, and in whomsoever’s hands the land may be, and ordering specific performance of said tonnage contract; and that after trial hereof an injunction issue, perpetually inhibiting * * * defendant * * * from removing any more tonnage arising from the logs and timber or lumber from said lands, without first tendering and delivering (same) to plaintiff.”
The case was tried in the district court upon certain evidence and admissions in addition to what has been stated, from which it appears that between April, 1907, and July, 1908, defendant sold to the Tremont Lumber Company, the timber on certain sections of the land in question, lying, apparently, about 8 or 10 miles to the northeast of plaintiff’s road; that the Tremont Company cut the timber and hauled the logs on a tramroad, which it owned, and which ran through the timber to its mill at Pyburn, a point on the Rock Island Railroad some 11 miles to the north of plaintiff’s road; that it sawed the logs into some 8,000,000 feet of lumber, which was delivered to and transported by the Rock Island Road; and there are further admissions as to what plaintiff would have made, as its proportion of the through rate, if the lumber had been delivered to it as the initial carrier, as to the connections between plaintiff’s road and other roads, as to the possibility and cost of connecting its road by a tramroad with the tracts of land from which the timber was sold, and with other of the tracts here in question. . It being admitted, inter alia:
“That the Winn Parish Lumber Company does not own, and never has owned, any lands connecting the Pack lands .with the line of the Louisiana & Arkansas Railway at any point on the line.”
Opinion.
It is conceded that, as defendant has, by its own contract, agreed to the tonnage stipulation, it is bound thereby; but there is a difference of opinion as to the interpretation of that stipulation, and we shall endeavor just now to ascertain what was really intended.
[1] Plaintiff contends that, by agreeing that all tonnage arising from the manufacture of the timber or logs should be transported over its road, Kelley and Daugherty bound themselves that the timber and logs, as well as the tonnage arising from their manufacture, should be so transported. De *295 fendant insists that the stipulation means what the language used imports, and nothing more. So far as we are informed, Kelley and Daugherty owned no mill when they made the purchase in question, and had no idea of building one; but we think that it was within the contemplation of the contractants that the tonnage stipulation should run with the land, and it was probably the expectation on both sides that the timber would, sooner or later, be converted into lumber and shipped out in that form. But we are bound to assume that men who buy and sell 18,000 acres of timbered land, and agree to pay and receive over half a million dollars for it, in one transaction, know the difference between timber or logs and the product arising from their manufacture, and that, going out of the way, as it appears to us, to specify the manufactured product as the tonnage concerning which they were contracting, they did so intentionally and not inadvertently, and that the result of the specification of the one was the exclusion of the other; for it is quite certain that they could as readily have included the timber as the product of the timber, if they had so desired.
What their motives were in contracting as they did is a matter of conjecture; but it may safely be assumed that each was looking out for his own interest. That Pack, as the vendor, and also as a stockholder in the railway company, was desirous of getting as much for himself and that company as he could, and that Kelley and Daugherty were parting with no more than they could help. It may be, therefore, that, though Pack would have stipulated for the timber and its products, the others were unwilling to go that far, and that the stipulation was therefore confined to the products. At any rate, and as a matter of fact, it was so confined, when it need not have been, if the contract-ants had thought proper to broaden it. It may be thought that a person who contracts to do a certain thing cannot, without a breach of his obligation, disable himself from doing it, and that is true, as a general rule; but, applying the rule to this case, it appears to us that the vendees must have been unwilling to bind themselves with respect to anything but the manufactured product of the timber, and that they must have had a reason for such unwillingness. Speculating upon the subject, we might say that Kelley and Daugherty may have contemplated the possibility of selling the standing timber, apart from the land, or selling the land and the timber to some one who might want to dispose of it in that way; and that they apprehended that if the property was burdened with a condition which would prevent the owner from doing as he pleased with the timber it would be rendered less salable, though it might make no' difference to one who intended to convert the timber into lumber on the spot. Whatever may have been their reasons, however, we take it for granted that they were able to say, in their written contract, what they meant; and we find nothing in the record to justify the conclusion that they did not mean what they said. As to the present defendant, there can be no doubt upon the subject, since it signed the contracts sued on after a litigation, in which it specifically denied the correctness of the interpretation placed by plaintiff on the stipulation in question, and alleged (in the cross-bill) that:
“There is nothing in the contract, aforesaid, which prevents this defendant from selling the timber on the lands, aforesaid, or which obligates this defendant to deliver, or cause to be delivered, to the Louisiana & Arkansas Railway Company, for transportation, the logs cut from the lands, aforesaid, sold to third persons.”
We therefore conclude that the specification of the manufactured product as the subject of the tonnage stipulation must be regarded as the intentional exclusion of the raw material; and hence that defendant did *297 not violate that stipulation in selling such timber as it did sell to the Tremont Lumber Company, and in allowing that company to transport it as it saw fit.
[3] Another point of difference is as to the obligation of the plaintiff to give to said first party hereto reasonable “service and rates and equal service and rates obtainable from other roads.”
Plaintiff’s contention is that the tonnage, as contemplated by the stipulatibn, should be delivered to its road, as the initial carrier, no matter upon what part of the land it may be produced, and although another company may connect its road, by a spur track, with the timber, or with any mill that may be erected in or among the timber.
Defendant, on the other hand, insists in effect that the company which builds a road or a spur track nearest to the place where the tonnage is manufactured is the one which furnishes the best service and rates; and hence that, if the defendant’s road is farther away, it does not give “equal service and rates, obtainable from other roads.”
The question thus presented would be an abstract one, so far as this case is concerned, were it not for the fact that plaintiff is seeking to have the obligation (or servitude, as the case may be) imposed by the tonnage stipulation recognized as a real right running with the property, from which point of view the question may be regarded as concrete, since we ought to determine what the right is which is so to be recognized.
The learned counsel for plaintiff have furnished us with a good many instances in which the word “service” (meaning railroad service) has been construed, but in other connections than as here used. As we interpret the whole contract now under consideration, it was not the intention of the parties thereto that the vendees of the land, or their assigns, should be subjected to any expense or loss, in furnishing to plaintiff the tonnage stipulated for, to which they would not be subjected in shipping such tonnage by another, road. Hence if, when the contract was made, the vendees had owned a mill, say, 10 miles from'plaintiff’s road and equally distant from another road, and the owner of the other road had built a spur track to the mill, whilst plaintiff had not done so, we should say that such owner had furnished the better service, within the meaning of the contract; .and the same thing could be said with regard to any mill and spur track which might be constructed now or in the future, with this qualification, however, that it would be a violation of the spirit of the contract for defendant, whether with deliberate purpose or not, to so place a mill as that it would be more convenient or less expensive to ship its product by another road than plaintiff’s, unless, upon inquiry, it should be made clearly to appear that no other course could have been pursued without greater expense or actual loss, as compared with the course first mentioned.
[2] The remaining question is whether the tonnage stipulation is susceptible of enforcement as a covenant running with the land, and against whomsoever may hereafter acquire the land.
Defendant’s counsel say that it cannot be so enforced, because that would be to establish a servitude upon both the land and the owner, consisting, as to the latter, in faciendo, and they invoke articles 655 and 709 of the Oivil Code, which read:
“Art. 655. One of the characteristics of the servitude is, that it does not oblige the owner of an estate subject to it to do anything but to abstain from doing a particular thing, or to permit a certain thing to be done on his estate. * * * ”
“Art. 709. Owners have a right to establish on their estates, or in favor of their estates, such servitudes as they deem proper, provided, nevertheless, that the services be not imposed on the person or in favor of the person, but only on an estate or in favor of an estate; and provided, moreover, that such services imply nothing contrary to public order.”
*299 We think it sufficiently clear, and the contrary is not asserted, that it was the intention of the contracting parties that the stipulation here in question should create a real right and obligation running with the land. Beyond that, it is evident that it was regarded as going to the essence of the contract; for we find in the record (in'the equity suit) the admission that G. W. Pack was a large stockholder in the—
“G. W. Pack Land & Lumber Co., and was also a large _ stockholder in the Louisiana & Arkansas Railroad, then about to be succeeded by the Louisiana & Arkansas Railway Company, and the motive or reason for the provisions of the contract of June 27, 1902, was such ownership of stock in the two companies by said Pack; and that said Pack could and would have prevented the sale, aforesaid, of said lands, unless the arrangement for the tonnage contract was embodied therein.”
Bearing those facts in mind, we proceed to consider the provisions of the Civil Code relied on by defendant, in connection with other provisions of the same statute.
The two articles invoked by defendant are found under the title “Of Servitudes”; but the first article under the same title reads as follows:
“Art. 646. All servitudes which affect lands may be divided into two kinds, personal and real. Personal servitudes are those attached to the person for whose benefit they are established, and terminate with his life. This kind of servitude is of three sorts: Usufruct, use and habitation. Real servitudes, which are also called prsedial or landed servitudes, are those which the owner of an estate enjoys on a neighboring estate, for the benefit of his own estate.”
There is a title, “Of Usufruct, Use and Habitation,” under which there are many articles regulating those servitudes “in favor of the person”; but, apart from that, there are other articles, under the title “Of Servitudes,” which provide as follows, to wit:
Articles 754 et seq.: That servitudes may be real or personal, as the parties, may agree; article 757, that, for example, if the owner of a house near a garden or a park should stipulate for the right of walking and gathering fruits and flowers therein, the servitude would be considered personal, and could “not be made real but by express declaration of the parties” that such right becomes real, “if the person stipulating for the servitude acquires it as owner of the house, and for himself, his heirs and assigns;” and article 758, that, “when the right granted is merely personal- to the individual, it expires with him, unless the contrary has been expressly stipulated.”
Prom all of which it is evident that article 709, in so far as it is supposed to prohibit servitudes “in favor of the person,” must be susceptible of some other construction than that placed on it by defendant. Again, we find, under the same title, provisions to the effect (article 663) that the owner of an estate may compel his neighbor to fix and mark the limits of his (contiguous) estate; (671) that when a building threatens ruin the neighbor has a right of action to compel the owner to demolish it or prop it up; (686) that in cities and towns and their suburbs one may compel his neighbor to contribute to the making and repairing of the fence held in common; (691) that one may oblige his neighbor to have torn up a tree which the latter may have planted on the boundary between their respective estates, and which injures him; (712) that one may stipulate for the support of his house or timbers on the wall of his neighbor, and that, in such case, the neighbor is' bound to keep his wall in condition to bear the burden, “though he may relieve himself of this charge by abandoning the wall”; (773) that works necessary to the use and preservation of a servitude are to be made at the cost of him to whom the servitude is due, “unless the title hy which it is acquired shows the con *301 trary”; and (775, 815) that, where the owner of the estate by which the servitude is due
“is "bound by the title to make the necessary works for the use and preservation of the servitude at his own expense, he may always exonerate himself hy giving up the estate which owes the servitude to the owner of the estate to which it is due.”
From all of which it follows that the premise upon which defendant relies, to wit, that under C. C. arts. 655 and 709 no servitude can he established which consists in faciendo, is sound only to the extent that a person upon whose estate a servitude is imposed, which purports to require him to do anything, “may always exonerate himself by giving up the estate,” etc.
In other words, by comparing the different articles of the Code, the one with the other, it seems clear that the provisions and prohibitions of articles 655 and 709, upon which defendant relies, mean nothing more than that a servitude, as such, cannot be made to bear upon one individual in favor of another, but that the owner of the serving estate upon which, and which alone, the servitude can rest has always the right to relieve himself of the burden, so far as it may purport to require any action on his part, by abandoning the estate, or so much of it as may be subject to the servitude.
On the other hand, the Civil Code, under the title “Of Conventional Obligations,” contains a number of articles defining and establishing real rights, some of which read as follows:
“Art. 2010. When obligations are attached to immovable property they form the third branch of the first division of obligations of this chapter, and are called real obligations.
“Art. 2011. Not only the obligation, but the right resulting from a contract relative to immovable property, passes with the property. Thus, the right of servitude passes with the property, and thus, also the heir or other acquirer will have the right to enforce a contract made for the improvement of the property by the person from whom he acquired it.
“Art. 2012. Real obligations may be created in three ways: 1. By the alienation of immovable property, subject to a real condition, either expressed or implied by law. 2. By alienating to one person the immovable property, and to another some real right to be exercised upon it. 3. By the creation of a right of mortgage upon the immovable property. All these contracts- give rise to obligations purely real on the part of those who acquire the land, under whatever species of title they possess it; they are not personally liable but the real property is, and, by abandoning it to the obligee, they relieve themselves from all the responsibility. * * *
“Art. 2013. The real obligation, created by condition annexed to the alienation of real property, is susceptible of all the modifications that the will of the parties can suggest, except such as are forbidden by law. * * * ”
“Art. 2015. Not only servitudes, but leases and all other rights, which the owner had imposed on his land before the alienation of the soil, form real obligations which accompany it in the hands of the person who acquires it. * * sjc >>
“Art. 2017. * * * A rent charge may be created and imposed on particular property, independent of any alienation of it, for the security or extinguishment of a debt, and it may be perpetual or temporary, and, in either case, forms a real obligation, which passes with the land. * * * ”
“Art. 2019. Considered with respect to those who have contracted them, some real obligations are also personal; such as are created by mortgage for the payment of a debt. Others are strictly real, both as to the contracting party and his heirs or other successors. A mortgage given to secure the debt of another, without any personal responsibility, is an example of the latter kind. But no real obligation is personal, as -to a subsequent possessor of the property on which it is created, unless he has made it such by his own act.”
We have also in our Code the title “Of Rents' and Annuities,” and the subtitle “Of Rent of Lands,” under which we find the following, to wit:
“Art. 2779. The contract of rent of lands is a contract by which one of the parties conveys and cedes to the other a tract of land or any other immovable property, and stipulates that the latter shall hold it as owner, but reserving to the former an annual rent of a certain sum of money, or of a certain quantity of fruits, which the other party binds himself to pay him.
“Art. 2780. It is of the essence of this conveyance that it be made in perpetuity. If it be made for a limited time, it is a lease.”
From the law to which we have thus referred, it is evident that, whilst all servitudes are charges laid upon estates for the *303 benefit of other estates, or of individuals, other than their owners, it is not true that all charges laid upon estates for the benefit of persons, other than their owners, are servitudes. The obligation of the purchaser of an estate to pay the price creates no servitude on the estate, and the lawmaker does not deal with it under the title “Of Servitudes,” but, under the title “Of Conventional Obligations,” and he provides that:
“Art. 2014. There are also conditions implied by law which create a real obligation, such as the obligation to pay the price to the seller.”
In the instant case, the obligation (assumed by the vendees in the act by which they acquired the property) with respect to the future disposition of the timber, then forming part of the real estate purchased by them, was a condition, annexed to the alienation of the property, which created, not a servitude, either upon the property or upon the vendees, but a real obligation, other than a servitude, as to the property and the vendees, which passes with the title, and also a personal obligation as to the vendees; the creation of such obligation not being within the prohibition relied on or any other, so far as we are informed, and it not being one that can be enforced by any species of personal coercion, but being an ordinary civil obligation enforceable in the manner provided in such cases.
From our investigation of the subject, it appears to us not altogether unlikely that the same conclusion would be reached under the French law, upon which defendant’s counsel appear to rely, as interpreted by the later commentators. Article 686 of the Code Napoléon, of which article 709 of our Code is a literal translation, was adopted, the French writers tell us, as a result of the French Revolution, and with a view of eliminating from the law of France the last vestige of that feudalism whereby one person might be bound in servitude to another. Laurent, referring to the matter, says:
“The night of the fourth of August put an end forever to the abuses of feudalism.”
Droit Civil, Francais, vol. 7, § 126, Toullier (on the same subject), says:
“No servitude can obligate the owner of the serving estate to do anything.” Toullier, Des Bien (Brussels Ed. 1837) book 2, §§ 378, 379.
The people for whose relief the particular enactment in question was intended were mainly the peasants, who, under the feudal régime and the conditions by which they were surrounded, were tied down to the particular estates upon which they happened to be born, and were subjected to an infinite variety of oppressive and, in some instances, degrading exactions in the interest of the seigneur or lord of the manor; and not only did the compilers of Code NapolSon take the affirmative action expressed in article 686, prohibiting servitudes upon and in favor of persons, but they omitted from the Code those provisions for the creation and regulation of real rights which we have quoted from our Civil Code. The latest of the commentators upon the Code NapolSon have, however, this, among other things, to say in regard to the effect of the action so taken, to wit:
“There are in our laws, as in the Roman law,” say Baudry-Laeontinerie, “two kinds of servitudes, personal servitudes and real servitudes, servitutes aut personarum sunt aut re-rum. In what relates to personal servitudes, the Civil Code has preserved the thing whilst suppressing the name. In the title, and in the text, devoted to the subject, and every where else, the lawmaker has avoided, with minute care, the employment of the expression ‘personal servitudes,’ consecrated by a secular tradition. It sounded badly, at the time, it appears, because it recalled, though remotely, recollections of the personal servitudes and forced labor of the feudal system. As to real servitudes, the lawmaker has preserved both the thing and the name, but here, also, a scruple, inspired by reminiscences of feudalism, has led. to the adding to the word ‘servitude’ a sort of definition, in the title IY, ‘Des Servitudes ou Services Foncier,’ and to the declaration, in article 638, that a servitude establishes no pre-eminence in favor of one heri *305 tage over another. * * * Personal and real servitudes possess, since the adoption of the Code, the common trait of having a thing for their object; the Code prohibits every tie which subjects a person either to another or to a thing; there no longer exists the servitude of a person to a person, since the disappearance of slavery; upon the other hand, one cannot create a tie which subjects a person to a thing, since the suppression of feudalism (432), title III, to which we do not, to-day, hesitate to apply the term ‘Of Personal Servitudes,’ is divided into two chapters, devoted, the first, to usufruct, the second, to use and habitation. Baudry-Lacontinerie, Traité de Droit Civil — Des Biens (2d Ed. 1899) pp. 291, 292. * * * One may contract that the proprietor of the serving estate shall play an active role; that he shall cut the wood, in the case suggested (article 698), but he could always free himself from the charge by abandoning the serving estate (article 699), though he would not have that right if he was tied by an obligation, id. p. 527, No. 811. * * * In case of doubt as to the nature of the service that has been stipulated, it is for the courts to decide, finally, whether the parties have intended to establish a real servitude or a personal servitude, or a simple right of obligation. The terms of the act of agreement should furnish the principal element of the decision.” Id. p. 539, No. 814.
From the Commentary of M. Hue, we make the following excerpts:
“403. A servitude can be imposed only upon an estate in favor of an estate. Undoubtedly services may be imposed upon a person, but only in the form of an obligation (a titre d’obligation). * * * What the Code forbids is the imposition of such services upon a person, as servitudes (á titre de servitude); that is to say, the combining of things in such a way that whoever shall become the owner of an estate shall owe, by that alone, the services agreed on to whomsoever shall become the owner of some other estate. It is necessary that the service imposed, as a servitude, shall have for its object the maintenance of the serving estate in a condition useful for the exploitation or advantage of the dominant estate. No service that is not of that character can be stipulated as a servitude.”
Articles 697, 698, 699, of the Code Napoléon correspond with articles 772, 773, 775, of our Code, which provide that he to whom-a servitude is due has the right to make the necessary works to preserve the same; that such works are at his expense, “unless the title by which it is established shows the contrary”; and that, even where the owner of the estate which owes the servitude is bound by his title to make the works necessary for the use and preservation of the servitude, he may always exonerate himself by giving up the estate.
Commenting on the articles 69*7, 698, 699, C. N., M. Hue says (432) that they speak for themselves and require no explanation; that the works referred to are to be made on the serving estate, since for such works, on his own property, the owner of the dominant estate requires no special law; that the law refers exclusively to works established for the use or preservation of the servitude; and that it is evident that such works should be made at the expense of the owner of the dominant estate; and the learned author proceeds:
“As to the owner of the serving estate, he can, on principle, be held to do only that which may be required for the maintenance of the servitude. That is what is meant by saying that the servitude cannot consist in faciendo. 432 (bis). Nevertheless, as a result of the combination of articles 698 and 699, the rule stated may be derogated from by means of an express provision; such express provision being necessary even in the case of a servitude of support (oneris ferendi), where, in the Roman law, it is supplied by implication. But, in spite of that derogation, it is always the -estate, not the person, which owes the servitude. Consequently art. 699. In the case even where the proprietor of the serving estate is charged, by the title, with the making, at his expense, of the works necessary for the use and preservation of the servitude, he may always relieve himself of the charge by abandoning the estate to the proprietor of the estate to which the servitude is due. * * * From the fact that the charge is purely real, it follows that the owner of the serving estate may relieve himself by abandoning the estate, and, as it concerns a matter where interests of an exclusively private character are involved, a renunciation of the right of abandonment would be competent.” Th. Hue., Commentaire, Theorique et Practique, Du Code Civil, vol. 4, Nos. 403, 404, 405, 432, bis. See, also, Dalloz, Les Codes Annotés, Code Civil, vol. 1, p. 503, No. 40.
Defendant seems to find some objection to the use of the term “covenant running with the land,” but it appears to us fairly to express the idea of the real obligation “an *307 nexed to the alienation of real property” provided for by our law, and upon which this suit is based. It has, moreover, already been sanctioned by this court, in a case in which Bermudez, O. J., as the organ of the court, referring to certain language advertising the sale of real estate and expressing the intention of the owner to leave a certain space in front of the property advertised for the use of the purchasers, held that it constituted “a covenant running with the land.” Delogny v. Mercer, 43 La. Ann. 205, 8 South. 903. In a later case, in which it appeared that a railroad company had acquired land with the obligation to fence and drain it and construct crossings thereon, it was held that a servitude was thereby created in favor of the adjacent laúd, and that the right to enforce it passed with the title, which was about the same thing as to hold that it was covenant running with the land. Taylor v. N. O. Terminal Co., 126 La. 420, 52 South. 562, 139 Am. St. Rep. 537.
In the common-law states, the proposition contended for by plaintiff appears to us to be sustained by the weight of authority. A. & E. Enc. of Law (2d Ed.) vol. 8, p. 138 et seq.; Cyc. vol. 2, p. 1078; Bald Eagle Valley R. Co. v. Nittany Valley R. Co., 171 Pa. 284, 33 Atl. 239, 29 L. R. A. 423, 50 Am. St. Rep. 807; Hickey v. Lake Shore, 51 Ohio St. 40, 36 N. E. 672, 23 L. R. A. 396, 46 Am. St. Rep. 545; Doty v. Chattanooga N. Ry., 103 Tenn. 564, 53 S. W. 944, 48 L. R. A. 160.
It is therefore ordered, adjudged, and decreed that, in so far as the judgment appealed from rejects the demand of the plaintiff for damages, and denies the writ of injunction prayed for, said judgment be affirmed, and that, in so far as it rejects and dismisses the demand of plaintiff to the effect that the tonnage contract sued on attaches to and affects the property which is the subject of that contract, said judgment be avoided, annulled, and reversed; and it is further decreed that the tonnage contract provided for, and signed by and in accordance with the final decree in equity suit No. 412, described in the body of the petition and recorded in Book R, p. 747, of the conveyance office of the parish of Winn, be held to be a contract and obligation running with the land and operating as a burden thereon, in whomsoever’s hands the land may be, until said contract, as herein interpreted, shall have been fully executed and satisfied. It is further decreed that in all other respects the demands of plaintiff be rejected, and that defendant pay all costs.